# Exhibit A

**to**
**DEFENDANT'S NOTICE OF REMOVAL
TO THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF
NEVADA**

# Exhibit A

SEP 15

# KAEMPFER CROWELL RENSHAW GRONAUER & FIORENTINO
## ATTORNEYS AT LAW

8345 WEST SUNSET ROAD, SUITE 250
LAS VEGAS, NEVADA 89113
702.792.7000
Fax: 702.796.7181
E-Mail: info@kcnvlaw.com

DATE: September 15, 2014

*FACSIMILIE - 480-994-4096 &*
*CERTIFIED MAIL - RETURN RECEIPT REQUESTED*

TO:     Nancy Vander Kooi
        CAG Acceptance, L.L.C.
        c/o Chapman Automotive Group, LLCP. O. Box 12375
        Tempe, AZ 85284

RE:     Process Served in Nevada

FOR:    CAG Acceptance, L.L.C.

Enclosed are copies of legal process received by the statutory agent of the above company as follows:

| | | |
|---|---|---|
| 1. | TITLE OF ACTION: | **Mary Gibbs-Bolender, individually and on behalf of all persons similarly situated, Plaintiffs vs. CAG Acceptance, L.L.C., a foreign corporation; Does I through X, inclusive; and Roes 1 through 10, inclusive, Defendants** |
| 2. | DOCUMENT(S) SERVED: | **Summons and Complaint** |
| 3. | COURT AND CASE NO.: | **Eight Judicial District Court Clark County, Nevada Case No.:A-14-706754-B Dept No.: XIII** |
| 4. | NATURE OF ACTION: | **Class Action, Violations of NRS Chapters 97,104, 598; breach of Implied Covenant of Good Faith and Fair Dealing** |

6.   HOW SERVED:                                Personal Service

7.   DATE OF SERVICE:                           September 15, 2014

8.   DATE FOR APPEARANCE OR ANSWER DUE:         October 06, 2014

9.   ATTORNEY(S) FOR PLAINTIFF(S):              Sophia A. Medina, Esq.
                                                Nevada Bar No.: 12446
                                                Legal Aid Center of Southern Nevada, Inc.
                                                725 E. Charleston Blvd.
                                                Las Vegas, NV 89104
                                                Phone: (702) 386-1070 x 1435

10.  REMARKS:                                   For your information.


                                                SIGNED:


                                                _____
                                                PROCESS COORDINATOR


You are advised that the attached document contains certain deadlines, the failures of which to meet may
result in severe financial or other legal ramifications to you.  Kaempfer Crowell Renshaw Gronauer &
Fiorentino does not undertake to represent you in this matter unless we are specifically retained to do so.
Information contained on this transmittal form is recorded for Kaempfer Crowell Renshaw Gronauer &
Fiorentino's record keeping purposes only and to permit quick reference for the recipient.   This
information does not constitute a legal opinion as to the nature of the action, the amount of damages, the
answer or other response date, or any information that can be obtained from the documents themselves.
The recipient is responsible for interpreting the documents and for taking the appropriate action.

# ORIGINAL
# District Court
## Clark County, Nevada

MARY GIBBS-BOLENDER, individually and on
behalf of all persons similarly situated,

        Plaintiffs,

vs.

CAG Acceptance, L.L.C., a foreign corporation;
DOES I through X, inclusive; and ROES 1 through 10,
inclusive,

        Defendants.

Case No.:  A-14-706754-B
Dept. No:  XIII

## **SUMMONS**

**NOTICE!   YOU HAVE BEEN SUED.   THE COURT MAY DECIDE AGAINST YOU WITHOUT YOUR BEING HEARD
UNLESS YOU RESPOND WITHIN 20 DAYS.   READ THE INFORMATION BELOW.**

**TO THE DEFENDANT(S):**   A civil Complaint has been filed by the plaintiff(s) against you for the relief set forth in the
Complaint.

    1.   If you intend to defend this lawsuit, within 20 days after this Summons is served on you, exclusive of the day of
service, you must do the following:

        (a)   File with the Clerk of this Court, whose address is shown below, a formal written response to the
Complaint in accordance with the rules of the Court, with the appropriate filing fee.

        (b)   Serve a copy of your response upon the attorney whose name and address is shown below.

    2.   Unless you respond, your default will be entered upon application of the plaintiff(s) and failure to so respond will
result in a judgment of default against you for the relief demanded in the Complaint, which could result in the taking of money
or property or other relief requested in the Complaint.

    3.   If you intend to seek the advice of an attorney in this matter, you should do so promptly so that your response
may be filed on time.

    4.   The State of Nevada, its political subdivision, agencies, officers, employees, board members, commission
members and legislators each have 45 days after service of this Summons within which to file an Answer or other
responsive pleading to the Complaint.

Submitted by:

_[signature]_

SOPHIA A. MEDINA, ESQ.
Nevada Bar #12446
LEGAL AID CENTER OF SOUTHERN NEVADA, INC.
725 E. Charleston Blvd.
Las Vegas, NV 89104
(702) 386-1070 Ext. 1453
Attorney for Plaintiff

STEVEN D. GRIERSON
Clerk of the Court

By: _[signature]_
    DEPUTY CLERK
    Regional Justice Center
    200 South Third Street
    Las Vegas, Nevada 89155
    LISAMARIE VAQUERO

Date
9-11-14

**NOTE:**   When service is by publication, add a brief statement of the object of the action.
        See Rules of Civil Procedure, Rule 4(b).

STATE OF _____ )

                                   )       ss:           **AFFIDAVIT OF SERVICE**

COUNTY OF _____ )

_____, being duly sworn says: That at all times herein affiant was and is a citizen of the United States, over 18 years of age, not a party to or interested in the proceeding in which this affidavit is made.   That affiant received _____copy(ies) of the Summons and Complaint, _____

_____

of _____, 20___, and served the same on the _____ day of _____ on the _____ day of _____, 20___, by:

**(Affiant must complete the appropriate paragraph)**

1.  delivering and leaving a copy with the defendant _____ at (state address) _____.

2.  serving the defendant _____ by personally delivering and leaving a copy with _____, a person of suitable age and discretion residing at the defendant's usual place of abode located at: (state address) _____.

         (Use paragraph 3 for service upon agent, completing A or B)

3.  serving the defendant _____ by personally delivering and leaving a copy at: (state address) _____.

    a.  with _____ as _____, an agent lawfully designated by statute to accept service of process;

    b.  with _____, pursuant to NRS 14.020 as a person of suitable age and discretion at the above address, which address is the address of the resident agent as shown on the current certificate of designation filed with the Secretary of State.

4.  personally depositing a copy in a mail box of the United States Post Office, enclosed in a sealed envelope postage prepaid (check appropriate method):

              _____ ordinary mail
              _____ certified mail, return receipt requested
              _____ registered mail, return receipt requested

    addressed to the defendant _____ at the defendant's last known address which is (state address):_____.

                                                   _____
                                            Signature of person making service

**SUBSCRIBED AND SWORN TO** before me this _____ day of _____, 20_____.

_____
**NOTARY PUBLIC** in and for said County and State

My commission expires: _____

                                                (SEAL)

Electronically Filed
09/10/2014 09:42:35 AM

*signature*

**CLERK OF THE COURT**

**COMPB**
DAN L. WULZ, ESQ.
Nevada Bar No.: 5557
SOPHIA A. MEDINA, ESQ.
Nevada Bar No.: 12446
**LEGAL AID CENTER OF
SOUTHERN NEVADA, INC.**
725 E. Charleston Blvd.
Las Vegas, NV 89104
Telephone: (702) 386-1070 x 1453
Facsimile: (702) 386-1453
smedina@lacsn.org

J. RANDALL JONES, ESQ.
Nevada Bar No.: 1927
CAROL L. HARRIS, ESQ.
Nevada Bar No.: 10069
**KEMP, JONES & COULTHARD, LLP**
3800 Howard Hughes Pkwy, 17th Floor
Las Vegas, Nevada 89169
Telephone: (702) 385-6000
Facsimile: (702) 385-6001
c.harris@kempjones.com
Attorneys for Class

## EIGHTH JUDICIAL DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| MARY GIBBS-BOLENDER, individually and on behalf of all persons similarly situated,<br><br>     Plaintiffs,<br><br>vs.<br><br>CAG Acceptance, L.L.C., a foreign corporation; DOES I through X, inclusive; and ROES 1 through 10, inclusive,<br><br>     Defendants. | Case No.: A- 1 4 - 7 0 6 7 5 4 - B<br>Dept. No: XI I I<br><br>(Exempt from Arbitration – Class Action; Declaratory and Injunctive Relief Sought) |

## CLASS ACTION COMPLAINT

Plaintiff, MARY GIBBS-BOLENDER, individually and on behalf of all others similarly

situated (hereafter "Class Representative"), by and through counsel, Dan L. Wulz, Esq., and

Sophia A. Medina, Esq., of Legal Aid Center of Southern Nevada, Inc., and J. Randall Jones, Esq., and Carol L. Harris, Esq., of Kemp, Jones & Coulthard, LLP, hereby files this COMPLAINT against Defendants, CAG Acceptance, L.L.C., a foreign corporation; DOES I through X, inclusive, and ROES 1 through 10, inclusive, and alleges and states as follows:

## I.     INTRODUCTION

1.     This is a class action complaint to redress the statutory and common law violations committed by Defendant, C.A.G. Acceptance, L.L.C., a foreign corporation through the installation and operation of the "Passtime Elite GPS" device on the Class' vehicles, and disregarding the Class' Retail Installment Sales Contracts ("RISC"). Defendant was assigned the RISC for each class member and in turn violated NRS Chapters 97, 104 and 598. Defendant then committed the tort of trespass to chattels by wrongfully rendering Plaintiff's and members of Subclass A's vehicles inoperable prior to default as defined in the RISC. Defendant also breached the contract and the implied covenant of good faith and fair dealing. Plaintiff and the Class, as defined, seek declaratory and injunctive relief, as wells as costs and attorney's fees. Plaintiff and Subclass A, as defined, seek the same relief, plus damages, statutory damages, and punitive damages.

## II.     PARTIES

2.     Class Representative, MARY GIBBS-BOLENDER, is, and was at all times relevant herein, a resident of the State of Nevada, County of Clark, City of Las Vegas.

3.     Defendant, CAG Acceptance, L.L.C., is a foreign limited-liability company organized in Arizona and existing under and by virtue of the laws of the State of Arizona, is authorized to do business in Nevada, and may be served with process by service upon its registered agent Kaempfer, Crowell, Renshaw, Gronauer & Fiorentino, LTD, 510 W Fourth St., Carson City, NV, 89703.

4.      Pursuant to NRCP 10(a) and Bender v. Clark Equipment Co., 111 Nev. 884, 845, 897 P.2d 208, 209 (1995), the identity of Defendants designated as DOES I through X and ROE Corporations 1 through 10 are unknown at the present time; however, it is alleged and believed that these Defendants were involved in the initiation, approval, support, or execution of the wrongful acts upon which this litigation is premised, or of similar actions directed against Plaintiff of which she is presently unaware.  As the specific identities of these parties are revealed through the course of discovery, the DOE and ROE Corporation appellation will be replaced to identify these parties by their true names and capacities.

### III.    JURISDICTION

5.      Class Representative, MARY GIBBS-BOLENDER, is a resident of the State of Nevada, County of Clark, City of Las Vegas.

6.      Defendant, CAG Acceptance, L.L.C., is a business entity registered with the Nevada Secretary of State and which conducts business in the State of Nevada, County of Clark, City of Las Vegas.

7.      The transactions and occurrences that give rise to Plaintiff's individual claims against Defendant occurred in the City of Las Vegas, County of Clark, Nevada. The transactions and occurrences that give rise to the claims of the Class against Defendant occurred in the State of Nevada.

8.      The Class seeks declaratory and injunctive relief, as well as actual, punitive, and statutory damages in an amount exceeding $10,000.00.

9.      The Eighth Judicial District Court, Clark County, Nevada has personal jurisdiction over both Plaintiff and Defendant and subject matter jurisdiction pursuant to the Article 6 Section 6 of the Nevada Constitution and NRS 4.370.

### IV.    FACTUAL ALLEGATIONS

10.     Plaintiff, MARY GIBBS-BOLENDER, (hereinafter "Ms. Gibbs-Bolender" or

"Class Representative") repeats and re-alleges the allegations contained in paragraphs 1 through 9 as if fully set forth herein.

11.    Ms. Gibbs-Bolender is a single mother of three, two 15-year olds and one 10-year old. Her 10-year old child is chronically ill with asthma and eczema which causes a low immune system and recently suffered the loss of her father. Mary is unable to work because of the amount of doctor's and counseling appointments that her child needs.

12.    On September 6, 2013, Ms. Gibbs-Bolender went to Chapman Chrysler Jeep, located on 930 Auto Show Drive, Henderson, NV, 89014, in order to purchase a vehicle for personal use to take her chronically ill child to regular trips to the doctor.

13.    Ms. Gibbs-Bolender decided to purchase, on credit, a used, 2005 Chrysler Town & Country LX, VIN 2C4GP44R85R469523 (hereinafter "the vehicle") for a total sales price of $12,579.89. The dealer, Chapman Chrysler Jeep, prepared a "Simple Interest Vehicle Contract and Security Agreement" dated September 6, 2013, also known as a NRS Chapter 97 Retail Installment Sales Contract (hereinafter "RISC"), attached hereto as **Exhibit 1**.

14.    The RISC, identifying Chapman Chrysler Jeep as the creditor, states a down payment of $1,000.00, paid in cash, leaving $11,579.89 as the "Amount Financed" with $5,944.46 as the "Finance Charge." See Ex. 1.

15.    The RISC provides "Your payment schedule will be:" 45 monthly payments of $389.43 beginning October 21, 2013. See Ex. 1.

16.    The RISC, as required by law (NRS 97.301, NRS 97.299, NAC 97.050), defines default for nonpayment as the failure to make a payment later than 30 days past the due date required by the agreement. See Ex. 1.

17.    While purchasing the vehicle, the salesperson did not inform Plaintiff about any GPS device on her vehicle. A GPS device was first mentioned while Plaintiff was signing all the sales documents after she paid her down payment. As Plaintiff was driving the car off of the lot,

the salesperson placed the GPS documents and associated DVD into her glove box and stated "everything you need to know is on the DVD." See CAG Operation Instructions, attached hereto as **Exhibit 2**.

18.    On September 12, 2013, after being assigned the RISC, CAG Acceptance, L.L.C., (hereinafter "CAG" or "Defendant") sent Plaintiff a "welcome letter" incorrectly stating that CAG was her "loan servicer" and how to make payments. The letter did not discuss the "Passtime Elite GPS" device on the vehicle. See the September 12, 2013 Welcome Letter, attached hereto as **Exhibit 3**.

19.    Plaintiff made her first payment, October 21, 2013 on time.

20.    In October 2013, prior to the second payment's due date, Plaintiff moved to a new address due to issues in her daughter's school. Additionally in October, 2013, Plaintiff's medical insurance company, NV Check Up, had closed and shifted to Medicaid. In the transition period between NV Check Up and Medicaid, Plaintiff was forced to pay out of pocket for her daughter's prescriptions. Because of the added moving and medical expenses, Plaintiff contacted Defendant to let it know she would be unable to make the second payment (November 21, 2013) on time.

21.    When Ms. Gibbs-Bolender notified CAG of her difficulties making the November payment, the parties negotiated for Plaintiff's payments to now be due on the first of each month rather than the 21st of each month. So at that point, Ms. Gibbs-Bolender's next payment would be due December 1, 2013. See Loan Modification, attached hereto as **Exhibit 4**.

22.    Plaintiff was able to make the December, 2013 and January and February, 2014 payments in full and on time.

23.    On March 11, 2014, Defendant contacted Plaintiff to inform her that her check for the March 1, 2014 payment had been dishonored. Despite explaining her situation, Defendant remotely disabled Plaintiff's vehicle on March 11, 2014, for non-payment, **20** days prior to

default for non-payment as defined in the RISC.

24.     On March 14, 2014, Plaintiff's child became ill, and Plaintiff was unable to drive her child to the hospital because the vehicle was disabled.  She was unable to take her 10-year old child to the hospital as her insurance did not cover ambulance rides.

25.     Because Plaintiff's vehicle was disabled, Plaintiff also had to cancel her 10-year old child's scheduled doctor's appointments.

26.     On March 19, 2014, Plaintiff brought her account current for the month, and CAG reactivated her vehicle, although Plaintiff lost 9 days of use of the vehicle.

27.     On or about April 1, 2014, Plaintiff contacted CAG and notified it that she would only be able to make a partial payment for April.  CAG agreed and allowed her to make a partial payment on April 1 and pay the remainder on April 16 with an additional $4.00 charged to her card for each payment.  CAG's employee, David, told Plaintiff that this would be the only time that they allow her to make a partial payment.  Plaintiff set her account to automatically charge the payment to her credit card on April 16, 2014.

28.     On April 16, 2014, **15** days prior to default for non-payment as defined in the RISC, CAG remotely disabled the vehicle for non-payment.  When Plaintiff contacted Defendant and demanded her vehicle to be restarted, Defendant attempted to charge Plaintiff $10.00 rather than the $4.00 agreed to on April 1, 2014.  After asking why she needed to pay $10 rather than the agreed $4.00, Defendant's employee stated "to teach customers a lesson for bouncing a check."  Plaintiff was able to get Defendant to start her vehicle after a phone conversation which lasted more than an hour.

29.     Because Defendant disabled Plaintiff's vehicle on April 16, 2014, for non-payment for over an hour, Plaintiff was unable to drive one of her 15-year old children to a scheduled doctor's appointment.

30.     Plaintiff was unable to pay the full amount on June 1, 2014. As a CAG employee

Page 6 of 25

told Plaintiff that she was not allowed to make any more partial payments, Plaintiff did not

attempt to do so.  Consequently, Defendant remotely disabled the vehicle on June 7, 2014, for

non-payment, **23** days prior to default for non-payment as defined in the RISC. Plaintiff paid the

balance on June 15, 2014, and Defendant restarted the vehicle the same day, although Plaintiff

lost 9 days of use of the vehicle.

31.     Because Defendant remotely disabled the vehicle, Plaintiff was unable to drive

her child to a scheduled doctor's appointment on June 13, 2014.

32.     According to the Kelley Blue Book, the suggested retail value of the vehicle at the

time of the electronic repossession was approximately $4,850.00. See Kelley Blue Book Older

Car Guide May – August 2013, attached hereto as **Exhibit 5**.

33.     The average rental car value, based upon the rates of three commercial rental car

companies, of a vehicle similar to that of Ms. Gibbs is $96.45 per day. See Rental Car Quotes,

attached hereto as **Exhibit 6**.

### V.     CLASS ACTION ALLEGATIONS

34.     This is a uniquely local class action on behalf of the victims of Defendant's

repeated violations of NRS and NAC Chapter 97 as well as NRS Chapter 104.  The violations of

Nevada law regarding contracts formed in Nevada makes this an intrastate controversy against a

local defendant whose practices have deprived CAG's Nevada customers of their rights under

Nevada's laws, statutes, and regulations.

35.     The Class Representative brings this action individually and on behalf of all

others similarly situated pursuant to NRCP 23(a) and NRCP 23(b)(1), (b)(2), or (b)(3).

The Class consists of the Class and Subclass A.  The Class seeks declaratory and injunctive relief

and consists of all individuals who purchased a vehicle on credit in the State of Nevada within 4

years prior to the date of the filing of this Complaint, pursuant to a Retail Installment Sales

Contract that was assigned to Defendant, and which vehicle was equipped with any device

allowing Defendant to remotely disable it, and with terms or asserted rights contrary to those stated in the Retail Installment Sales Contract required by NRS Chapter 97. Subclass A consists of all individuals in the Class as defined and seeks the same declaratory and injunctive relief, but also seeks damages as a result of having additionally experienced disablement of their vehicle by Defendant for non-payment prior to being in default for non-payment as defined by the RISC as required by law.

36.    Numerosity. Membership in the Class is so numerous as to make joinder of all Class members impracticable. During the time period applicable to the Class, upon information and belief, there are roughly two thousand members of the Class as defined. In 2010, CAG had been assigned 35 such RISCs; assigned 591 such RISCs in 2011; assigned 698 such RISCs in 2012; and assigned 105 such RISCs from January 2013 through April 2013. See CAG Acceptance Legislative Data attached hereto as **Exhibit 7**. On information and belief, all of the consumers in the Class as defined were given the same "Operation Instructions" discussed below. Further, on information and belief, Subclass A as defined is so numerous as to make joinder of all Subclass A members impracticable, as it is believed discovery will show that hundreds of Subclass A members had their vehicles remotely disabled by Defendant for non-payment prior to default for non-payment as defined in the NRS Chapter 97 RISC. The disposition of the Class's and Subclass A's claims in a class action will obviate the need for repeated individual adjudications of the same issues.

37.    Commonality. There are questions of law or fact common to all members of the Class and Subclass A that control this litigation and which predominate over any individual issues. The common questions of law or fact include, but are not limited to, the following: (a) whether the Class is entitled to injunctive relief to enforce the terms of their NRS Chapter 97 RISCs providing the consumer is not in default for non-payment until 30 days past due, and enjoin Defendant's inconsistent assertion that it can electronically disable a vehicle for non-

Page 8 of 25

payment when 2 days past due; (b) whether Defendant has violated NRS 97.165 (commonly

known as the "one document rule") by providing to the Class the "Operation Instructions"

document with terms contrary to those agreed upon in the NRS Chapter 97 RISC ; (c) whether,

in intentionally intermeddling with and depriving the use of Subclass A's vehicles, Defendant

committed the tort of trespass to chattels; (d) whether Defendant has violated NRS 104.9609 by

rendering Subclass A's vehicles unusable prior to default; (e) whether Defendant, by knowingly

violating state statutes and regulations, has committed a deceptive trade practice as defined by

NRS 598.0923(3) as to the Class; (f) whether Defendant has breached its contracts as to the

Class by purporting to change the default date for nonpayment defined in the RISCs; (g)

whether, through its transactions with the members of the Class, Defendant has breached the

implied covenant of good faith and fair dealing; and (h) whether the Class has a remedy for

Defendant's actions as described and, if so, the nature of that remedy.

     38.    <u>Typicality</u>. The claims of the Class Representative are typical of the claims of the

Class and Subclass A in that each seeks the same remedies and relief upon the same legal

theories and operable facts, and the Class Representative has no interest adverse to the interests

of the other members of the Class and Subclass A.

     39.    <u>Adequacy of Representation</u>. The Class Representative and experienced Class

Counsel will fairly and adequately protect the interests of the Class.

     40.    <u>Superiority</u>. A class action is superior to other methods for the fair and efficient

adjudication of this controversy because, inter alia: (a) the prosecution of separate actions would

create a risk of inconsistent or varying adjudications, making this case suitable for certification

as a class action under NRCP 23(b)(1); (b) Defendant has acted or refused to act on grounds

generally applicable to the Class and Subclass A, thereby making appropriate final injunctive

relief or corresponding declaratory relief with respect to the Class as a whole, and making the

case suitable for certification under NRCP 23(b)(2); (c) the complexity of the issues involved,

the size of the individual Class member's claims, and the limited resources of the Class members would clearly make it impracticable for all individual members of the Class to individually seek legal redress for the actions of Defendant, making a class action superior to other available methods for the fair and efficient adjudication of the controversy, and questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, making the case suitable for certification under NRCP 23(b)(3); (d) this action would facilitate an orderly and expeditious resolution of the Class' claims, and will foster economies of time, effort, and expense; (e) when the Court has adjudicated whether Defendant is liable, then the claims of all Class members may be determined by the Court; and (f) this action presents no difficulty that would impede its maintenance by the Court as a class action and is the best available means by which the Class Representative and all Class members may seek redress for the harm caused by Defendant.

## VI.    <u>CLAIMS FOR RELIEF</u>

41.    Class Representative repeats and re-alleges the allegations contained in all prior paragraphs as if fully set forth herein.

### A.    INJUNCTIVE RELIEF TO ENFORCE CONTRACT (ALL CLASSES)

42.    The RISC required by NRS 97.301, NRS 97.299, and NAC 97.050, provides as to "Default": "If you default in the performance of this agreement, because (1) you fail to make a payment later than 30 days past the due date required by the agreement…." (Ex. 1)

43.    Contrary to the RISC required by law, the "Operation Instructions" provides: "You are given a two day grace period after your payment is due to get your payment to CAG Acceptance… On the third day, if payment is not received, your vehicle will not start." (Ex. 2.)

44.    The provision in the "Operation Instructions", as alleged in paragraph no. 43 above, violates NRS 97.301, NRS 97.299, and NAC 97.050 in failing to provide a 30-day grace period before a buyer is in default for nonpayment.

Page 10 of 25

45.     Additionally, NRS 104.9609(1)(c) provides that after default a secured party may render equipment unusable.

46.     As stated above, the RISC defines default as failure to make a payment later than 30 days past the due date required by the agreement. (Ex. 1.)

47.     Here, in Ms. Gibbs-Bolender's case, Defendant rendered her vehicle unusable 20 days prior to default in March, 15 days prior to default in April, and 24 days prior to default in June.

48.     Therefore, Defendant breached the contract required by NRS 97.301, NRS 97.299, and NAC 97.050 as well as violated NRS 104.9609 on three separate occasions by disabling Plaintiff's vehicle prior to default for nonpayment.

49.     Defendant has no right to continue remotely disabling the vehicles of the Class prior to default for nonpayment as defined by the NAC 97.050 contract. (Ex. 1.)

50.     Sudden, unlawful deprivation of personal transportation by Defendant's ongoing daily use of electronic disablement of the personal vehicles of the Class constitutes irreparable harm or harm for which monetary compensation alone is inadequate.

51.     As a proximate result of the Defendant's past and ongoing unlawful actions, the Class continues to suffer the irreparable harm described above for which monetary compensation is inadequate.

52.     The Class seeks injunctive relief to enforce the RISC and prevent Defendant from further operation of the "Passtime Elite GPS" device before the Class is in default for nonpayment as defined under the RISC.

53.     Additionally, NRS 104.9625(1) provides that if "a secured party is not proceeding in accordance with this article, a court may order or restrain collection, enforcement or disposition of collateral on appropriate terms and conditions."

54.     Under the common law, NRS Chapter 30, and NRS 104.9625(1), the Class seeks

injunctive relief restricting Defendant from further use of the "Passtime Elite GPS" starter interruption device before the Class is in default as defined through the RISC.

## B.    TORT OF TRESPASS TO CHATTELS (SUBCLASS A)

55.    Defendant committed the intentional tort of trespass to chattels against Subclass A's vehicles, and the interference is so frequent that it may rise to the intentional tort of conversion.

56.    Trespass to chattels may occur when a person intentionally uses or intermeddles with a chattel in the possession of another. "A person will be liable to the possessor of the chattel only if: '(a) he dispossesses the other of the chattel, or (b) the chattel is impaired as to its condition, quality, or value, or (c) the possessor is deprived of the use of the chattel for a substantial time, or (d) bodily harm is caused to the possessor, or harm is caused to some person or thing in which the possessor has a legally protected interest.'" Cerros v. N. Las Vegas Police Dep't, 2008 U.S. Dist. LEXIS 22636, 10-11 (D. Nev. Feb. 28, 2008) (citing Restatement (Second) of Torts § 217 (1965)).

57.    From March 11, 2014 – March 19, 2014; April 16, 2014; and June 7, 2014 – June 15, 2014, Plaintiff was not in default of her obligations under the retail installment sales contract for her 2005 Chrysler Town & Country LX.  During time periods to be determined through discovery, each member of Subclass A was not in default of his/her obligations under the RISC for his/her vehicle.

58.    From March 11, 2014 – March 19, 2014; April 16, 2014; and June 7, 2014 – June 15, 2014, Defendant intermeddled with Plaintiff's chattel, i.e. the 2005 Chrysler Town & Country LX, by remotely disabling the ignition and preventing the vehicle from being used prior to being in default for nonpayment.  During time periods to be determined through discovery, Defendant intermeddled with each member of Subclass A's chattel, i.e. his/her vehicle, by remotely disabling the ignition and preventing the vehicle from being used prior to being in

default for nonpayment.

59.     Through Defendant's intermeddling with Plaintiff's vehicle, she was deprived of the use of the chattel for the substantial time period of 18 days.  Through Defendant's intermeddling with the vehicle of each member of Subclass A, he/she was deprived of the use of the chattel for time periods to be determined in discovery.

60.     As a result of Defendant's trespass against the property of each member of Subclass A, each member of Subclass A suffered loss of use of his/her vehicle as the natural and probable result of Defendant's tortious act.

61.     "A party may recover loss of use damages for the time period in which that party has lost use of her personal vehicle as a result of damages to her automobile. These damages may be measured by reasonable rental car costs for a reasonable period ..." Dugan v. Gotsopoulos, 117 Nev. 285, 289, 22 P.3d 205, 207-08 (2001).   Additionally, a party does not need to actually rent a vehicle to recover loss of use damages if that party is financially unable to rent a vehicle. Id.

62.     Taking the average between three quoted prices for 18 days of a rental minivan (similar to Plaintiff's vehicle) from leading rental car companies, the Class Representative sustained loss of use damages totaling $1,736.15. See Ex. 6.  A like amount is capable of computation for each member of Subclass A upon full discovery.

63.     Defendant engaged in the intentional tort of trespass to chattels stated above with the intent to deprive Subclass A of its property rights.  Further, Defendant knew of the probable harmful consequences of the wrongful acts and engaged in a willful and deliberate failure to act to avoid those consequences.

64.     NRS 42.005(1) requires a finding of malice prior to awarding punitive damages. NRS 42.001(3) defines express or implied malice as "conduct which is intended to injure a person or despicable conduct which is engaged in with a conscious disregard of the rights or

safety of others." See also, Evans v. Dean Witter Reynolds, Inc., 116 Nev. 598, 612, 5 P.3d 1043, 1052 (2000).

65.     Defendant acted with malice, express or implied, in that Defendant's conduct was willful, intentional and done in reckless disregard of its possible results.  Further, NRS 47.240(1) provides a conclusive presumption of a malicious and guilty intent from the deliberate commission of an unlawful act, for the purpose of injuring another.

66.     Subclass A is entitled to punitive damages in an amount sufficient to punish Defendant and to deter others from like conduct.

67.     Subclass A is entitled to recover attorney's fees under NRS 18.010 if it does not recover more than $20,000.00.

### C.     VIOLATIONS OF NRS CHAPTER 97 (ALL CLASSES)

68.     NRS 97.165 (commonly known as the "one document rule") provides in pertinent part: "Every retail installment contract must be contained in a single document which must contain the entire agreement of the parties, including any promissory notes or other evidence of indebtedness between the parties relating to the transaction…." (Emphasis supplied.)

69.     "The purpose of the single document requirement is to protect buyers from the deception and ambiguities which can arise when multiple documents are used."  Kenworthy v. Bolin, 564 P.2d 835, 838 (Wash. 1977).

70.     In violation of NRS 97.165, Defendant created a separate document named "Operation Instructions" (Ex. 2) to be used in conjunction with the RISC, and which purports to vary the terms of the RISC.

71.     The "Operation Instructions" document provides that Defendant installed a "Passtime Elite GPS system" in the Class members' vehicles.  See (Ex. 2).

72.     NRS 97.301, using the mandatory "shall," requires that vehicle sellers use the forms prescribed pursuant to NRS 97.299.  NRS 97.299, using the mandatory "shall," requires

the Commissioner of Financial Institutions to prescribe, by regulation, the forms for contracts to be used in the sale of vehicles. The Commissioner has done so at NAC 97.050, and using the mandatory "must," requires sellers to use the form contract provided by the regulation. The contract required by NRS 97.301, NRS 97.299, and NAC 97.050, provides as to "Default": "If you default in the performance of this agreement, because (1) you fail to make a payment later than 30 days past the due date required by the agreement...."

73.     Contrary to the RISC required by law, the "Operation Instructions" provides: "You are given a two day grace period after your payment is due to get your payment to CAG Acceptance... On the third day, if payment is not received, your vehicle will not start." (Ex. 2.)

74.     The provision in the "Operation Instructions", as alleged in paragraph no. 73 above, violates NRS 97.301, NRS 97.299, and NAC 97.050 in failing to provide a 30-day grace period before a buyer is in default for nonpayment.

75.     Further, Defendant cannot purport to have consumers waive their NRS Chapter 97 rights or remedies as NRS 97.275(2) provides: "No act or agreement of the retail buyer before or at the time of making of a retail installment contract, retail charge agreement or purchases thereunder shall constitute a valid waiver of any of the provisions of this chapter or of any remedies granted to the buyer by law."

76.     For violations of NRS Chapter 97, Defendant is barred by NRS 97.305 from the recovery of any finance charge, official fees, or any charge for delinquency or collection; meaning, as applied to Plaintiff individually, all Defendant can collect as assignee of the RISC is the vehicle selling price ($10,999.00), plus sales tax ($926.64), minus the down payment she paid ($1,000.00), which equals $10,925.64. A like amount is capable of computation for each member of the Class upon full discovery.

77.     Furthermore, the Class is entitled to attorney's fees and costs if it recovers less than $20,000 pursuant to NRS 18.010.

### D.   VIOLATIONS OF NRS CHAPTER 104 (ALL CLASSES)

78.     Defendant violated NRS 104.1304 and NRS 104.9609; as such, the Class is entitled to remedies for violation of NRS 104.9609 et. seq., through NRS 104.9625.

#### 1. Violation of NRS 104.1304 Obligation of Good Faith

79.     The RISC is a contract covered within the Nevada Uniform Commercial Code.

80.     Pursuant to NRS 104.1304, every contract within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement.

81.     Through transactions with the Class and Subclass A, Defendant did not deal in good faith. This is evidenced through the fact that the Class was provided additions to the RISC which violate NRS Chapters 97, 104 and 598 as alleged, and as to Subclass A, was wrongfully dispossessed of their vehicles on numerous occasions by rendering the vehicles unusable.

82.     As a result of Defendant's actions, Plaintiff individually sustained loss of use damages in the amount of $1,736.15 (Ex. 6), and each member of Subclass A sustained loss of use damages in an amount capable of computation to be determined through discovery.

83.     Due to Defendant's failure to comply with NRS 104.1304, the Class was forced to hire an attorney and is therefore entitled to attorney's fees pursuant to NRS 18.010(2)(a) in the event of recovery of less than $20,000.00.

#### 2. Violation of NRS 104.9609

84.     NRS 104.9609(1)(c) provides that after default a secured party may render equipment unusable.

85.     As stated above, the RISC defines default as failure to make a payment later than 30 days past the due date required by the agreement. (Ex. 1.)

86.     Here, Defendant rendered Plaintiff's vehicle unusable 20 days prior to default for nonpayment in March, 15 days prior to default for nonpayment in April, and 24 days prior to default for nonpayment in June, and rendered each member of Subclass A's vehicle unusable

prior to default for nonpayment for periods of time to be determined through discovery. A like
determination is capable of being made for each member of Subclass A upon full discovery.

87.     Therefore, Defendant violated NRS 104.9609 on multiple occasions by disabling
the vehicles of Subclass A prior to default for nonpayment.

### 3. Remedies for Violations of NRS 104.9609 et. seq.,

88.     NRS 104.9625(3)(b) provides that "[i]f the collateral is consumer goods, a person
that was a debtor or a secondary obligor at the time a secured party failed to comply with this
part may recover for that failure in any event an amount not less than the credit service charge
plus 10 percent of the principal amount of the obligation or the time-price differential plus 10
percent of the cash price." See also, In re Schwalb, 347 B.R. 726, 754 (Bankr. D. Nev. 2006).

89.     In the Class Representative's individual case, the credit service charge is
$5,944.45, and ten percent of the principal amount of the obligation is $1,157.99. (Ex. 1.) Said
amounts are capable of computation for each member of Subclass A upon full discovery.

90.     Therefore, the Class Representative individually is entitled to $7,102.44 pursuant
to NRS 104.9625(3)(b). A like amount is capable of computation for each member of Subclass
A upon full discovery.

91.     Furthermore, NRS 104.9625(2) states that "a person is liable for damages in the
amount of any loss caused by a failure to comply with this article."

92.     Due to CAG's failure to comply with this article, Ms. Gibbs-Bolender has
suffered loss of use damages in the amount of $1,736.15 (Ex. 6). A like amount for loss of use is
capable of computation for each member of Subclass A upon full discovery.

93.     Additionally, NRS 104.9625(1) provides that if "a secured party is not proceeding
in accordance with this article, a court may order or restrain collection, enforcement or
disposition of collateral on appropriate terms and conditions."

94.     Pursuant to NRS 104.9625(1) the Class and Subclass A seeks injunctive relief

restricting Defendant from further use of the starter interrupt device prior to 30 days after a payment is due.

95.     Due to Defendant's failure to comply with NRS 104.1304 and NRS 104.9609, the Class and Subclass A was forced to hire an attorney and is therefore entitled to attorney's fees pursuant to NRS 18.010(2)(a) in the event of recovery of less than $20,000.00.

### E.     VIOLATIONS OF NRS Chapter 598 (ALL CLASSES)

96.     NRS 598.0923(3) states that a person engages in a "deceptive trade practice" when in the course of his or her business, he or she knowingly violates a state of federal stature or regulation relating to the sale or lease of goods or services.

97.     Defendant has, in the course of its business, knowingly violated state statutes and a regulation relating to the sale of goods: NRS Chapter 97 as alleged, NAC Chapter 97 as alleged, as well as NRS 104.1304 and 104.9609 as alleged.

98.     Violations of NRS Chapter 598 are actionable pursuant to NRS 41.600.

99.     NRS 41.600 allows actions to be brought by any person who is a victim of consumer fraud. NRS 41.600(2)(e) defines consumer fraud as "a deceptive trade practice as defined in NRS 598.0915 to 598.0925, inclusive.

100.    As stated above, Defendant committed a deceptive trade practice as defined by NRS 598.0923(3). Therefore, Defendant committed consumer fraud as defined by NRS 41.600(2)(e), and The Class and Subclass A are entitled to the remedies provided through NRS 41.600(3).

101.    Pursuant to NRS 41.600(3), the Class and Subclass A re entitled to recover any damages the Class sustained, any equitable relief that the court deems appropriate, and attorney's fees and costs.

102.    As a result of Defendant's violation of NRS Chapter 598, Subclass A has suffered loss of use damages. See Ex. 6.

**F.    ANTICIPATORY BREACH OF CONTRACT (THE CLASS)**

103.    In Nevada, in order to have an anticipatory breach claim, there must be a repudiation of the contract.  Additionally, "A contractual anticipatory repudiation must be clear, positive and unequivocal." Covington Brothers v. Valley Plastering, Inc. 93 Nev. 355, 360, 566 P.2d 814, 817.

104.    Here, the Class and Defendant's assignor entered into valid and existing contracts for the purchase of their vehicles through the RISC. Ex.1.

105.    The Class performed by making all payments on the vehicles prior to default for nonpayment stated in the contract.

106.    The contract states the definition of default as "you fail to make a payment later than 30 days past the due date required by the agreement...." See Ex. 1.

107.    Defendant clearly, positively, and unequivocally repudiated the contract by changing the 30-day past due period of default for nonpayment agreed to in the contract, and instead stating a 2-day past due period through the Operation Instructions placed inside the glove boxes of the Class members' vehicles. See Ex. 2.

108.    By changing the period of default for nonpayment, Defendant anticipatorily breached the contract.

109.    The Class seeks specific performance of the default terms agreed upon in the contract.

**G.    BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (ALL CLASSES)**

110.    The Class and Defendant's assignor entered into contracts, the RISCs. (Ex. 1.)

111.    It is well established within Nevada that every contract imposes upon the contracting parties the duty of good faith and fair dealing.  Hilton Hotels Corp. v. Butch Lewis

Prods., 109 Nev. 1043, 1046 (Nev. 1993). Thus, Defendant owed a duty of good faith and fair dealing to the Class.

112.    Through transactions with the Class and Subclass A, Defendant did not deal in good faith. This is evidenced through the fact that the Class was provided additions to the RISC which violated NRS Chapters 97, 104 and 598 as alleged, NAC Chapter 97 as alleged, as well as Defendant's numerous wrongful electronic repossessions.

113.    The Class's expectation that Defendant would deal with it in good faith and fairly was denied by the above stated actions.  Therefore, Defendant breached its duty of good faith and fair dealing.

114.    As a result of Defendant's actions, Plaintiff individually sustained loss of use damages in the amount of $1,736.15 (Ex. 6), and each member of Subclass A sustained loss of use damages in an amount to be determined through discovery.

115.    Due to Defendant's failure to comply with the implied covenant of good faith and fair dealing, the Class and Subclass A was forced to hire an attorney and is therefore entitled to attorney's fees pursuant to NRS 18.010(2)(a) in the event of recovery of less than $20,000.00.

### H.    REMEDIES/ADDITIONAL LEGAL THEORIES

116.    Class Representatives incorporate all prior paragraphs as though fully set forth herein.

117.    Whether viewed as equitable remedies for the aforementioned legal theories of recovery, or as equitable or statutory causes of action, the Class also seeks the following:

#### 1.  Declaratory Judgment

118.    Declaratory relief is a historical equitable remedy.  In addition, the State of Nevada has enacted the Uniform Declaratory Judgments Act, NRS 30.010 et seq.  Further, NRCP 23(b)(2) authorizes declaratory relief where the party opposing the Class has acted or refused to act on grounds generally applicable to the Class.

119.    The facts of this case state a justiciable controversy in which a claim of right is asserted against one who has an interest in contesting it.

120.    The controversy is between persons whose interests are adverse.

121.    The Class has a legally protectable interest in the controversy.

122.    The issue involved in the controversy is ripe for determination.

123.    This court has the power by law to declare the rights, status and other legal relations of the parties whether or not further relief is or could be claimed, and a declaration may be either affirmative or negative in form and effect, and such declarations have the force and effect of a final judgment or decree.

124.    The Class seeks all equitable declaratory relief and/or statutory declaratory relief and/or NRCP 23(b)(2) declaratory relief that arises from or is implied by the facts, whether or not specifically requested, including but not limited to: (a) a declaration of the rights of the Class with respect to the conflicting default terms in the "Operation Instructions" and the NAC Chapter 97 Retail Installment Sales Contract , (b) a declaration that the Class is entitled to injunctive relief, (c) a declaration establishing that electronically disabling the Class' vehicles prior to the 30-day default defined in the RISC is both a breach of contract and unlawful, and (d) a declaration that the Class is entitled to attorney's fees and costs.

## 2.   Injunctive Relief

125.    Injunctive relief is a historical equitable remedy.  In addition, the State of Nevada has enacted NRS 33.010 et seq.  In addition, NRCP 23(b)(2) authorizes injunctive relief where the party opposing the Class has acted or refused to act on grounds generally applicable to the Class.

126.    Additionally, NRS 104.9625(1) provides that if "a secured party is not proceeding in accordance with this article, a court may order or restrain collection, enforcement or disposition of collateral on appropriate terms and conditions."

127.    The Class does not have an adequate remedy at law.

128.    It appears from the facts alleged above herein that the Class is entitled to the relief demanded, and such relief or any part thereof consists in restraining the commission or continuance of the act(s) complained of, either for a limited period or perpetually, and accordingly the Class seeks all equitable injunctive relief that arises from or is implied by the facts, whether or not specifically requested, including an injunction (a) to enforce the RISC and (b) prevent Defendant from further operation of the "Passtime Elite GPS" device before the Class is in default for nonpayment as defined under the RISC.

### 3.  Injunctive Relief in Statutory Enforcement Action

129.    To obtain injunctive relief in a statutory enforcement action, all the Class need show is a reasonable likelihood that the statute was violated and that the statute specifically allows injunctive relief.

130.    NRS Chapters 97 and 104 were violated as alleged, and said violations also constitute violations of NRS Chapter 598.

131.    NRS 104.9625 authorizes a court to "order or restrain collection, enforcement or disposition of collateral on appropriate terms and conditions."

132.    A violation of NRS Chapter 598 is actionable pursuant to NRS 41.600, which authorizes equitable relief.

133.    The Class seeks all equitable relief that arises from or is implied by the facts, whether or not specifically requested, including an injunction requiring CAG to cease from further operation of the "Passtime Elite GPS" device before the Class is in default for nonpayment as defined under the RISC.

### VII.   PRAYER FOR RELIEF

WHEREFORE, the Class Representative, MARY GIBBS-BOLENDER, individually and on behalf of all persons similarly situated, requests the following relief against Defendant,

C.A.G. Acceptance, L.L.C.:

1. For both the Class and Subclass A, injunctive relief to enforce the terms of the NAC 97.050 RISCs and prevent Defendant from further operation of the "Passtime Elite GPS" device before the members of the Class are in default for nonpayment as defined under the RISC;

2. For each member of the Class, a computation of a reduced amount owed pursuant to NRS 97.301;

3. For members of Subclass A, statutory damages pursuant to NRS 104.9625(3)(b) for the Class Representative individually in the amount of $7,102.44, and for each member of Subclass A in an amount to be determined upon full discovery;

4. For members of Subclass A, for the tort of trespass to chattels, loss of use damages for the Class Representative individually in the amount of approximately $1,736.15 (Ex. 6), and for each member of Subclass A in an amount to be determined upon full discovery;

5. For members of Subclass A, for the tort of trespass to chattels, punitive damages in an amount sufficient to punish Defendant and to deter others from like conduct in excess of $10,000.00;

6. Attorney's fees and costs,

7. Prejudgment interest; and

8. Such other and further relief as the court deems just and equitable.

DATED this  9th  day of September, 2014.

**LEGAL AID CENTER OF
SOUTHERN NEVADA, INC.**

   /s/  Sophia A. Medina
DAN L. WULZ, ESQ.
Nevada Bar No.: 5557
SOPHIA A. MEDINA, ESQ.

Nevada Bar No.: 12446
**LEGAL AID CENTER OF**
**SOUTHERN NEVADA, INC.**
725 E. Charleston Blvd.
Las Vegas, NV 89104
Telephone: (702) 386-1070 x 1453
Facsimile: (702) 386-1453
smedina@lacsn.org

J. RANDALL JONES, ESQ.
Nevada Bar No.: 1927
CAROL L. HARRIS, ESQ.
Nevada Bar No.: 10069
**KEMP, JONES & COULTHARD, LLP**
3800 Howard Hughes Pkwy, 17th Floor
Las Vegas, Nevada 89169
Telephone: (702) 385-6000
Facsimile: (702) 385-6001
c.harris@kempjones.com
Attorneys for Class

## DEMAND FOR JURY TRIAL

Pursuant to NRCP 38, Plaintiff demands a trial by jury of any issue triable of right by a jury.

DATED this _9th_ day of September, 2014.

**LEGAL AID CENTER OF**
**SOUTHERN NEVADA, INC.**

_/s/  Sophia A. Medina_
DAN L. WULZ, ESQ.
Nevada Bar No.: 5557
SOPHIA A. MEDINA, ESQ.
Nevada Bar No.: 12446
**LEGAL AID CENTER OF**
**SOUTHERN NEVADA, INC.**
725 E. Charleston Blvd.
Las Vegas, NV 89104
Telephone: (702) 386-1070 x 1453
Facsimile: (702) 386-1453
smedina@lacsn.org

J. RANDALL JONES, ESQ.
Nevada Bar No.: 1927
CAROL L. HARRIS, ESQ.

Nevada Bar No.: 10069
**KEMP, JONES & COULTHARD, LLP**
3800 Howard Hughes Pkwy, 17th Floor
Las Vegas, Nevada 89169
Telephone: (702) 385-6000
Facsimile: (702) 385-6001
c.harris@kempjones.com
Attorneys for Class

# EXHIBIT 1

## SIMPLE INTEREST VEHICLE CONTRACT FOR SALE AND SECURITY AGREEMENT

**SECTION A:**
Buyer's Name(s):
Name:
Address:
City:                          County:
State:                         Zip:
Bus. Phone: (                  Res. Phone: (
Stock No.                      Salesman:

CREDITOR:
Address:
City:                          County:
State:                         Zip:
Phone: (

Date:

**SECTION B:**   DISCLOSURE MADE IN COMPLIANCE WITH FEDERAL TRUTH IN LENDING ACT.

| | | Your Payment Schedule will be: | | | (e) means an estimate |
|---|---|---|---|---|---|

| **ANNUAL PERCENTAGE RATE** The cost of your credit as a yearly rate. ___ % | Number of payments: | Amount of payments: | When payments are due: |
|---|---|---|---|

**FINANCE CHARGE** The dollar amount the credit will cost you. $

INSURANCE AND DEBT CANCELLATION: Credit life insurance, credit disability insurance and debt cancellation coverage, which is also known as GAP coverage, are not required to obtain credit, and will not be provided unless you sign and agree to pay the additional cost.

| | Premium: | Term: | (Signature): |
|---|---|---|---|
| Credit life: | $ | | I want credit life insurance: X |
| Joint credit life: | $ | | We want joint credit life insurance: X |
| Credit disability: | $ | | I want credit disability insurance: X |
| Credit life and disability: | $ | | I want credit life and disability insurance: X |
| Joint credit life and disability: | $ | | We want joint credit life and disability insurance: X |
| Debt cancellation coverage (GAP coverage): | $ | | I want debt cancellation coverage (GAP coverage): X |

**Amount Financed** The amount of credit provided to you or on your behalf. $

**Total of Payments** The amount you will have paid after you have made all payments as scheduled. $

**Total Sales Price** The total cost of your purchase on credit, including your down payment of $

You may obtain property insurance from anyone you want that is acceptable to the Creditor on page 1 of 2. If you get this insurance from the Creditor, you will pay $_____ and the term of the insurance will be _____.

SECURITY: You are giving a security interest in the goods or property being purchased.

☐ If checked, you are giving a security interest in _____

LATE CHARGE: If a payment is more than 10 days late, you will be charged $15 or 5 percent of the payment, whichever is less.

PREPAYMENT: If you pay off early you will not have to pay a penalty.

See your contract documents for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and penalties.

**SECTION C: ITEMIZATION OF AMOUNT FINANCED.**

1. Vehicle Selling Price $
   Plus: Documentary Fee $
   (This charge represents costs and profit to the dealer for items such as inspecting, cleaning, adjusting vehicles, and preparing documents related to the sale.)
   Plus: Emissions Inspection Fee $
   Plus: Other $
   Plus: Other $
   Plus: Other $
   Total Taxable Selling Price $
2. Total Sales Tax $
3. Amounts Paid to Public Officials
   a. Titling Fee $
   b. Registration Fee $
   c. Other $
   Total Official Fees (Add 3a through 3c) $
4. Optional, nontaxable, fees or charges $
   a. $
   b. $
   c. $
   d. $
   e. $
   f. $
   Total Optional, nontaxable, fees or charges
   (Add 4a through 4f) $
5. TOTAL CASH SALES PRICE

**SECTION D: VEHICLE RETAIL INSTALLMENT CONTRACT AND SECURITY AGREEMENT.**

This contract is made the _____ (day) of _____ (month) of _____ (year), between you, the Buyer(s) shown on page 1 of 2, and us, the Seller shown as Creditor on page 1 of 2. Having been granted a cash price and a credit price and having chosen to pay the credit price (known as the Total Sales Price in Section B on page 1 of 2), you agree to buy and we agree to sell, subject to all the terms of this contract, the following described vehicle, accessories and equipment (all of which are referred to in this contract as "Collateral").

New or Used: _____   Year and Make: _____

Series: _____   Body Style: _____   No. Cyl. _____

If truck, ton capacity: _____

Manufacturer's Serial Number: _____

Use for which purchased: ☐ Personal   ☐ Business   ☐ Agriculture

INCLUDING:
☐ Sun/Moon Roof      ☐ Air-Conditioning    ☐ Automatic Transmission
☐ Power Steering     ☐ Power Door Locks    ☐ Power Seats
☐ Power Windows      ☐ Tilt Wheel          ☐ Vinyl Top
☐ Cassette           ☐ Cruise Control      ☐ AM/FM Stereo
☐ Compact Disc Player

_____ Color _____ Tires _____ Lic. No.

You, severally and jointly, promise to pay us the Total of Payments (shown in Section B) according to the Payment Schedule (also shown in Section B), until paid in full, together with interest after maturity at the Annual Percentage Rate

(if negative, enter 0 and see line 11a) .................. $

7. Down Payment (Other Than Net Trade-In Allowance)

   a. Trade-In Sales Tax Credit ............... $

   b. Cash ....................................... $

   c. Manufacturer's Rebate ................ $

   d. Deferred Down Payment .............. $

   e. Other (_____) ......... $

   Down Payment (Add 7a through 7e) ........................ $

8. TOTAL DOWN PAYMENT AND

   NET TRADE-IN ALLOWANCE (Add 6 and 7) ............. $

9. UNPAID BALANCE OF CASH SALES PRICE

   (Subtract 8 from 5) ....................................... $

10. Plus Optional Insurance and Debt Cancellation Charges*

   a. Credit Life Insurance Premium

     Paid to (_____) Term (____) $

   b. Credit Disability Insurance Premium

     Paid to (_____) Term (____) $

   c. Debt Cancellation Coverage (GAP Coverage)

     Paid to (_____) Term (____) $

   d. Other Insurance

     Paid to (_____) Term (____) $

   Total Optional Insurance and Debt Cancellation

   Charges (Add 10a through 10d) ............................ $

11. Other Amounts Financed*

   a. Prior Credit or Lease Balance

     Paid to (_____) .................. $

   b. _____

     Paid to (_____) .................. $

   c. _____

     Paid to (_____) .................. $

   Total Other Amounts Financed (Add 11a through 11c) $

12. TOTAL AMOUNT FINANCED (Add 9, 10 and 11) $

*Seller may retain or receive a portion of this amount.

and any other obligation created in connection with this sale. You also acknowledge
and assigns, hereby waive any other security interest or mortgage which would
otherwise secure your obligations under this contract except for the security
interests and assignments granted by you in this contract.

Address where Collateral will be located:

Street _____ City _____

County _____ State ____

Your address after receipt of possession of Collateral:

Street _____ City _____

County _____ State ____

**Notice of Rescission Rights**

**(Option to Cancel)**

If the Buyer signs here, the notice of rescission rights on page 2 of 2 is applicable
to this contract.

Buyer's signature X _____

Co-Buyer's signature X _____

STATE DISCLOSURE REQUIREMENTS: The provisions of Section B and Section C are incorporated into this agreement for purposes of state disclosure requirements.

Additional Terms and Conditions: The additional terms and conditions set forth in this contract are a part of this contract and are incorporated herein by reference.

OPTION: _____ You pay no Finance Charge if the Total Amount Financed, Item No. 12, Section C, is paid in full on or before the _____ (day) of _____ (month) of _____ (year).

SELLER'S INITIALS: _____

**SECTION E:**

☐ If checked, you agree to use electronic records and electronic signatures to document this contract. Your electronic signatures on electronic records have the same effect as signatures on paper documents. We may designate one authoritative copy of this contract. If we do, the authoritative copy will be the electronic copy in a document management system we designate for storing authoritative copies. We may convert the authoritative copy to a paper original. We will do so by printing one paper copy marked "Original." This paper original will have your electronic signature on it. It will have the same effect as if you had signed it originally on paper.

If you agree to use electronic records and electronic signatures, we will comply with all applicable federal, state and local law and regulations.

UPON ENTERING INTO THIS CONTRACT, YOU WILL RECEIVE A PAPER COPY OF THE ORIGINAL CONTRACT ELECTRONICALLY SIGNED AND COMPLETE WITH ALL TERMS, CONDITIONS AND DISCLOSURES TO TAKE WITH YOU.

**NOTICE TO BUYER**

Do not sign this agreement before you read it or if it contains any blank spaces. You are entitled to a completed copy of this agreement. If you pay the amount due before the scheduled date of maturity of the indebtedness and you are not in default in the terms of the contract for more than 2 months, you are entitled to a refund of the unearned portion of the finance charge. If you fail to perform your obligations under this agreement, the vehicle may be repossessed and you may be liable for the unpaid indebtedness evidenced by this agreement.

If you are buying a used vehicle with this contract, as indicated in the description of the vehicle on page 1 of 2, federal regulation may require a special buyer's guide to be displayed on the window.

THE INFORMATION YOU SEE ON THE WINDOW FORM FOR THIS VEHICLE IS PART OF THIS CONTRACT. INFORMATION ON THE WINDOW FORM OVERRIDES ANY CONTRARY PROVISIONS IN THE CONTRACT OF SALE.

The text of the preceding two paragraphs is set forth below in Spanish:

Si usted está comprando un vehículo usado mediante este contrato según la descripción del vehículo en la página 1 de 2, la ley federal podrá exigir que ventanilla demuestre una guía especial para el comprador.

LA INFORMACIÓN QUE USTED VE EN LA FORMA DE VENTANILLA PARA ESTE VEHÍCULO ES PARTE DE ESTE CONTRATO. LA INFORMACIÓN EN LA FORMA DE VENTANILLA DOMINA CUALESQUIER ESTIPULACIÓN CONTARIA EN EL CONTRATO DE VENTA.

BUYER AND CO-BUYER ACKNOWLEDGE RECEIPT OF A TRUE AND COMPLETELY FILLED-IN PAPER COPY OF THE CONTRACT AND THE DISCLOSURE ON PAGE 1 OF 2 AT THE TIME OF SIGNING.

LIABILITY INSURANCE COVERAGE FOR BODILY INJURY AND PROPERTY DAMAGE CAUSED TO OTHERS IS NOT INCLUDED _____ IN SECTION C.

For "used" vehicles:

(1) Used Car Implied Warranty of Merchantability:
THE SELLERS HEREBY WARRANTS THAT THE VEHICLE WILL BE FIT FOR THE ORDINARY PURPOSES FOR WHICH THE VEHICLE IS USED FOR 15 DAYS OR 500 MILES AFTER DELIVERY, WHICHEVER IS EARLIER, EXCEPT WITH REGARD TO PARTICULAR DEFECTS DISCLOSED ON THE FIRST PAGE OF THIS AGREEMENT. YOU (THE PURCHASER) WILL HAVE TO PAY UP TO $25.00 FOR EACH OF THE FIRST TWO REPAIRS IF THE WARRANTY IS VIOLATED.

(2) Waiver of Used Car Implied Warranty of Merchantability:
ATTENTION PURCHASER: SIGN HERE ONLY IF THE DEALER TOLD YOU THAT THIS VEHICLE HAS THE FOLLOWING PROBLEM(S) AND THAT YOU AGREE TO BUY THE VEHICLE ON THOSE TERMS.

(2) Renuncia de un Carro Usado que implica una Garantía de Mercantil:
ATENCIÓN AL COMPRADOR: FIRME AQUÍ SOLAMENTE SI EL CONCESIONARIO LE HA PROMETIDO QUE EL VEHÍCULO TIENE ESTOS PROBLEMAS Y USTED ESTA DE ACUERDO EN COMPRAR EL VEHÍCULO EN ESOS TERMINOS.

1. ......................................................................................................................   Buyer (Comprador)

2. ......................................................................................................................   Buyer (Comprador)

3. ......................................................................................................................

## ADDITIONAL TERMS AND CONDITIONS

**Simple Interest Contract:** This is a simple interest contract. The Finance Charge, Total of Payments and Payment Schedule set forth in the disclosures on page 1 of 2 may differ. The final payment may differ depending upon the dates payments are received and events which occur after this contract is made. For example, early payments will have the effect of reducing your final payment, while late payments will cause your final payment to be higher. Your promise requires you to pay the final payment on the date due, which payment will be equal to all unpaid sums due under this contract, even if the amount of the final payment differs from the amount of final payment disclosed on page 1 of 2 of this contract.

**Default:** If you default in the performance of this agreement, [remainder illegible]

**Delinquency and Collection Charges:** [illegible]

**Demand for Full Payment and Additional Remedies on Default:** [illegible]

**Ownership of the Collateral:** [illegible]

**Location and Use of Collateral:** [illegible]

**Inspection of the Collateral:** [illegible]

**Taxes:** [illegible]

**Property Insurance:** [illegible]

**LIABILITY INSURANCE IS NOT REQUIRED BY THIS CONTRACT. YOU HAVE THE RIGHT TO CHOOSE THE PERSON THROUGH WHOM LIABILITY INSURANCE IS TO BE OBTAINED.**

**Information to Insurance Company or Agent:** [illegible]

**Credit Life Insurance** [illegible]

**NO WARRANTIES: THE SELLER MAKES NO REPRESENTATIONS, PROMISES OR WARRANTIES, EXPRESS OR IMPLIED, AS TO THE MERCHANTABILITY OF THE COLLATERAL OR WHETHER THE COLLATERAL IS FIT FOR ANY PARTICULAR PURPOSE OR USE** [remainder illegible]

**Return of** [illegible]

**Time is of the Essence:** [illegible]

**Exercising our Rights:** [illegible]

**Meaning of Words:** [illegible]

**Governing Law:** [illegible]

**Invalidity:** [illegible]

**Notice of Rescission Rights (Option to Cancel):** [illegible]

HERETO OR WITH THE PROCEEDS HEREOF, RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

If you are buying a used vehicle with this contract, as indicated in the description of the vehicle on page 1 of 2, federal regulation may require a special buyer's guide to be displayed on the window.

THE INFORMATION YOU SEE ON THE WINDOW FORM FOR THIS VEHICLE IS PART OF THIS CONTRACT. INFORMATION ON THE WINDOW FORM OVERRIDES ANY CONTRARY PROVISIONS IN THE CONTRACT OF SALE.

Assignment: Seller may transfer this contract to another person ("Assignee"). That person will have all of Seller's rights, privileges and remedies. The Seller may assign this contract electronically. Contact Assignee about this contract at _____.

Seller Signs: _____

By: _____

Title: _____

1. RECOURSE: Seller absolutely and unconditionally guarantees the prompt payment of other the total unpaid amount of the contract and any accrued interest or such other amount agreed to by Seller and Assignee in a separate agreement, together with all costs, expenses and reasonable attorney's fees incurred in the collection of said amount. Seller waives all defenses arising by reason of any failure to give notice of acceptance of this guaranty or default of Buyer, or arising by reason of any extension of time given to Buyer, or by reason of any failure by Assignee to pursue Buyer or the Collateral or other property of Buyer or to resort to other security or remedies which may be available, and waives any and all defenses arising out of the guaranty relationship.

Seller: _____   By: _____

Title: _____   Date: _____

2. REPURCHASE: In the event of default by the Buyer under any of the terms or conditions of the contract, Seller will repossess and repurchase the Collateral, or if the Collateral has already been repossessed, Seller will repurchase the Collateral at the place of repossession or recovery. The Collateral will be repurchased in any event AS IS, at a price equal to the then unpaid balance of this contract and any accrued interest or such other amount agreed to by Seller and Assignee in a separate agreement as in effect as of the default, together with all costs, expenses and reasonable attorney's fees incurred by Assignee in the collection of said amount. Seller waives all defenses arising by reason of any failure to give notice of acceptance of this agreement or default of Buyer, or arising by reason of extension of time given to Buyer, or by reason of any failure by Assignee to pursue Buyer or the Collateral or other property of Buyer or to resort to other security or remedies which may be available. At the time of repurchase, Seller shall pay to Assignee the purchase price in cash and Assignee may reassign to Seller without recourse and without warranties, express or implied, all the retention of lien instruments and all contracts or promissory notes which Assignee then holds upon such Collateral.

Seller: _____   By: _____

Title: _____   Date: _____

3. LIMITED ENDORSEMENT: In the event of default of Buyer before Buyer shall have paid the first _____ installments under the foregoing contract, Assignee may reassign the contract to Seller and Seller agrees, upon tender of such reassignment and in consideration thereof to pay to Assignee either the then unpaid balance of the contract and any accrued interest, or such other amount agreed to by Seller and Assignee in a separate agreement as in effect as of the reassignment, together with all costs, expenses and reasonable attorney's fees incurred in the collection of said amount. Seller waives all defenses arising by reason of any failure to give notice of acceptance of this agreement or default of Buyer, or arising by reason of any extension of time given to Buyer, or by reason of any failure by Assignee to pursue Buyer or the Collateral or other property of Buyer or to resort to other security or remedies which may be available, and Seller waives any other defenses that might otherwise have been available.

Seller: _____   By: _____

Title: _____   Date: _____

4. WITHOUT RECOURSE: This assignment shall be without recourse against Seller except for such obligations as are set forth in the assignment above.

Seller: _____   By: _____

Title: _____   Date: _____

Form No. 553-NV (10/12)

# EXHIBIT 2



OPERATION INSTRUCTIONS

Congratulations on the purchase of your vehicle and your loan with CAG Acceptance!

We just installed a Passtime Elite GPS system in your car. The unit communicates via satellite and cellular network towers. The anti theft feature is a delayed start. To operate, you turn your key to the "on" position (where the dash lights come on). Wait 2 seconds and you will hear 2 beeps. After you hear the beeps you start your car as normal. If you do not wait the two seconds in the "on" position before attempting to start your car, the vehicle will act as if you have a dead battery. You will have to turn the key back to the "off" position for five full seconds. You will hear one single beep, which means the unit has reset. You can then turn the key to the "on" position, and go through the above procedure again. This makes it a little harder for the car to get stolen should someone obtain your keys, but not know the operating procedure. The other part is a GPS locating system. Make sure you ask your insurance company if you can get an insurance discount for this GPS enabled anti-theft device; many of our customers are experiencing a reduction in their insurance premiums of about $25.00 a month.

The primary purpose of this device is to keep track of your payments. On the date your payment is due, you will hear a reminder tone when you start your car. This does not interfere with the use of your vehicle and only serves as a reminder that your payment is due that day. You are given a two day grace period after your payment is due to get your payment to CAG Acceptance, and this warning code will be heard until the payment is registered. On the third day, if payment is not received, your vehicle will not start. When you make your payment to CAG Acceptance, upon posting of your payment, the internet based system sends a signal to the unit in your vehicle which enables you to continue use of your vehicle hassle-free. You don't need to push any buttons or do anything once your payment is posted to your account. You may need to call CAG Acceptance if you have questions regarding how your payments are applied and the best way to ensure your payments are received and posted timely.

The Passtime Customer Service Team is available 24 hours a day, seven days a week. If you're having problems call 1-800-965-3260. As long as your payment has been made on time, the Passtime support team can help. You may be asked to pull out the remote control you are being provided with today. The remote is also used for other features such as your emergency code and valet mode (see instruction pamphlet). The remote is the key to Passtime's backup plan, so the remote should remain in your vehicle *at all times*. This first remote is included; if you need a replacement it will cost $50.00.

At the end of your loan, please contact CAG Acceptance and make an appointment to have the unit removed from your vehicle. The unit and remote is not charged to you because it belongs to CAG Acceptance. If you fail to bring it back, you will be charged $300.00 and may not receive a release of lien without the payment of this fee or the return of the unit.

1208 W. BROADWAY RD., MESA, AZ 85202
PO BOX 40488, MESA, AZ 85274-0488
(480) 945-0271
(800) 689-2444
WWW.CAGLOAN.COM

Passtime (800) 865-3260

# EXHIBIT 3



P.O. BOX 40488
MESA, AZ 85274-0488
WWW.CAGLOAN.COM

ACCEPTANCE, LLC.

(480) 945-0271
(800) 689-2444
FAX   (480) 425-2570

September 12, 2013

MARY  GIBBS-BOLENDER
3151 SOARING  GULLS DR      1081
LAS VEGAS, NV  89128

DEAR  MARY A GIBBS-BOLENDER :

Congratulations on the purchase of your new vehicle. On behalf of all of our employees, we would like to extend to you our appreciation for your business.

• Your payments are scheduled on a monthly basis.  This means that you must pay one payment on the same day each month.

As a CAG Acceptance customer, you have several options of how you can make your payments to us:

1.  You may, during the business hours of 8:00 am to 4:00 pm, Monday through Friday, bring your payment to our CAG Acceptance Offices, as follows:
    Mesa:      1208 W. Broadway Road, Mesa, AZ 85202
    Las Vegas: 3470 Boulder Highway, Las Vegas, NV 89121 (inside Chapman Value Center)
    Payments not received by 4 pm will be posted the next business day.
2.  After hours you may use our Night Drop Box at the Mesa location mentioned above.
3.  You may also mail your payments to the address at the top of this letter.
4.  Make Checks or money orders payable to:  C.A.G. Acceptance, L.L.C.
5.  Pay with ACH, Debit or Visa, Discover or Mastercard (**A SERVICE FEE IS CHARGED) by:
    • Online 24 hours a day at WWW.CAGLOAN.COM.  Your password is the last four digits of the primary account holder's social security number.  Please call our office during regular office hours to obtain your login user name before attempting to process your first payment.
    • Calling our office during regular office hours Monday – Friday 8:30 am – 4:30 pm at (480) 945-0271 or (800) 689-2444 and speaking with a customer representative
    • PAYMENTS MADE VIA ACH, DEBIT OR CREDIT CARD MUST BE MADE BY 3:45 PM ARIZONA TIME OVER THE PHONE WITH A REPRESENTATIVE TO POST TO YOUR ACCOUNT THE SAME DAY.  OTHERWISE, PAYMENTS ARE POSTED THE NEXT BUSINESS DAY.

• Your first payment in the amount of $ 389.43 is due on  10-21-2013.

C.A.G. Acceptance does not provide you with a payment coupon book; therefore it is IMPORTANT to clearly print your NAME and ACCOUNT NUMBER on your check or money order when making your payment.  After the payment has been posted to your account, you will receive a payment receipt showing your next payment due date and amount due.

• Your new loan number is: 21867

If you should have any questions concerning your loan, or need our assistance, please do not hesitate to contact our Customer Service Department at (480) 945-0271.  Again, thank you for the opportunity of allowing us to serve your financial needs.

Sincerely,

C.A.G. ACCEPTANCE, L.L.C.

# EXHIBIT 4

NOU-22-2013 09:10 From:702-457-1179                                    To:5024050    Page:1-3

P.O. BOX 40488
MESA, AZ 85274-0488
WWW.CAGLOAN.COM



ACCEPTANCE, LLC.                    FAX

(480) 945-0271
(800) 689-2444
(480) 425-2570

**LOAN MODIFICATION AGREEMENT**

November 21, 2013
MARY GIBBS-BOLENDER                    1097
8070 W RUSSELL RD
LAS VEGAS, NV 89113
Account:        21867
Collateral      2005 CHRYSLER TOWN & COUNTRY
                VIN# 2C4GP44R85R469523

| C.A.G. Acceptance Use Only | |
|---|---|
| EMPLOYMENT:<br>☐ Verbal ☐ Written Date: | CO EMPLOYMENT:<br>☐ Verbal ☐ Written Date: |
| RESIDENCY:<br>☐ Verbal ☐ Written Date: | RESIDENCY:<br>☐ Verbal ☐ Written Date: |
| INSURANCE:<br>☐ Verbal ☐ Written Date: | VERIFIED BY: |
| APPROVED BY: | DATE PROCESSED: |

**MONTHLY**

CAG Acceptance, L.L.C., ("we" or "us");    Motor Vehicle Contract and Purchase Money Security Agreement ("Contract")

You have requested that we modify your Account and Contract as indicated below. You acknowledge that this Modification changes your Contract: DUE DATE CHANGE

☒  Grant a due date change on the Contract.
☒  Others (specify):  GRANTING DUE DATE CHANGE FROM_ November 21st, 2013 to December 1st, 2013.
☒  You agree to pay us a processing fee of $0.00 for any extension, due date, payment amount or payment
   schedule changes.

[INITIAL HERE:        ]  If applicable. As a result of this Modification, your next scheduled payment is due on:
December 1st, 2013, and your next payment after that due date will be due on January 1st, 2013.
     You acknowledge and understand that: (1) this Modification is granted at the request of and as an
accommodation to you; (2) the processing fee (as applicable) may be limited by applicable law and represents a
portion of our actual costs and expenses associated with the collection,  processing and documentation of the
modification; (3) no interest is charged on the processing fee; (4) we are not obligated to modify your Contract again;
(5) every term and condition of the Contract is binding and in full force and effect, except as amended by this
Modification; (6) to the best of your knowledge, you do not have any defenses or claims against us under the
Contract or, TO THE EXTENT YOU HAVE ANY SUCH DEFENSES OR CLAIMS, YOU WAIVE THEM.

     This Modification and the Contract, together, constitute the complete and final agreement between you and
C.A.G. Acceptance, L.L.C., concerning the sale and financing of the vehicle you purchased. No prior statements or
understandings apply.
     This Agreement shall be construed in accordance with the laws of the state in which you purchased the
vehicle, without giving effect to its conflicts of law principles. This Agreement may be executed in counterparts. One of
more counterparts of this Agreement may be delivered via facsimile with the intention that they shall have the same
effect as an original executed counterpart. The parties agree that each party may accept and rely upon any facsimile
signature of the other party as an original signature for all purposes.

Customer:            _Signature_

Co-Customer:         _Signature_

CAG Acceptance, L.L.C.; Milo Trevizo ~ Collections Manager
                                        Signature

**By Signing This Modification, Customer, Co-Customer And Co-Signer (As Applicable) Acknowledge
Receipt Of A Copy Of This Modification.
This Document Is Not Valid Until Signed By A C.A.G. Acceptance, L.L.C. Manager**
THIS IS AN ATTEMPT TO COLLECT A DEBT.
ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

P.O. BOX 40488
MESA, AZ 85274-0488
WWW.CAGLOAN.COM

# CAG
## ACCEPTANCE, LLC.

(480) 945-0271
(800) 669-2444
FAX   (480) 425-2570

November 21, 2013

MARY A GIBBS-BOLENDER

21867-1

## Account Modification - Information Update

This form must be completed *in its entirety* and all additional documents must be provided in order for your account modification request to be considered for approval. Failure to complete this form and provide the requested documents will delay this process and may result in your request being denied.

**BUYER'S INFORMATION:**

Current Address: 6070 W Russell Rd #1097 City: LV   State: NV   Zip: 89113

Mailing Address: Same   City:   State:   Zip:

Home Telephone: (   )   Cell Telephone: (702) 513-9150

E-mail: marybolender@gmail.com

Employer: (retired)   Work Telephone/Extension: (   )   ext.
   Please provide a copy of your two most recent pay check stubs

Job Title:   Start Date:   Salary:

Address:   City:   State:   Zip:

**CO-BUYER'S INFORMATION (if Applicable):**

Current Address:   City:   State:   Zip:

Mailing Address:   City:   State:   Zip:

Home Telephone: (   )   Cell Telephone: (   )

E-mail:

Employer:   Work Telephone/Extension: (   )   ext.
   Please provide a copy of your two most recent pay check stubs

Job Title:   Start Date:   Salary:

Address:   City:   State:   Zip:

*ATTN: RebECA*

**C*A*G**
**ACCEPTANCE, LLC.**

P.O. BOX 40488
MESA, AZ 85274-0488
WWW.CAGLOAN.COM

(480) 945-0271
(800) 689-2444
FAX   (480) 425-2670

## VEHICLE INFORMATION:

License Plate Number: _380PLP4_   License Plate State: _NV_   Vehicle Color: _White_

## VEHICLE INSURANCE INFORMATION:

Please include an updated copy of your insurance card and/or insurance policy declarations page. Failure to provide this will delay this process and may result in your request being denied.

Insurance Company: _Geico_   Policy#: _3804/323-46-74-64_
Agent's Name: _Geico policy_   Expiration Date: _~~Oct~~ 3/2014_
Agent's Number: _____

## UPDATE REFERENCE INFORMATION:

Family Members: _none_

| | | |
|---|---|---|
| 01. | Name: | Relationship: ___ Address: |
| | | City: ___ State: ___ Zip: ___ Home Telephone: |
| | | ( ) ___ Cell Telephone: ( ) |
| 02. | Name: | Relationship: ___ Address: |
| | | City: ___ State: ___ Zip: ___ Home Telephone: |
| | | ( ) ___ Cell Telephone: ( ) |
| 03. | Name: | Relationship: ___ Address: |
| | | City: ___ State: ___ Zip: ___ Home Telephone: |
| | | ( ) ___ Cell Telephone: ( ) |

Friends:

| | | |
|---|---|---|
| 04. | Name: _Judy Mitchell_ | Relationship: _Friend_ Address: |
| | | City: _LV_ State: _NV_ Zip: ___ Home Telephone: |
| | | ( ) ___ Cell Telephone: (702) 468-4705 |
| 05. | Name: _Siquira Mitchell_ | Relationship: _Friend_ Address: |
| | | City: _LV_ State: _NV_ Zip: ___ Home Telephone: |
| | | ( ) ___ Cell Telephone: (702) 1109-2070 |
| 06. | Name: _Danielle Mikasell_ | Relationship: _Friend_ Address: |
| | | City: _LV_ State: _NV_ Zip: ___ Home Telephone: |
| | | ( ) ___ Cell Telephone: (702) 772-0979 |

Page 3 of 4
November 21, 2013
21867-1

NOV-22-2013 09:11 From:TBE-451 1115                                              TO:382 1868                    P.00/P.0

P.O. BOX 40488
MESA, AZ 65274-0488
WWW.CAGLOAN.COM



ACCEPTANCE, LLC.

FAX

(480) 945-0271
(800) 689-2444
(480) 425-2570

## Authorization / Consent
## For Communication via Electronic Services

CAG Acceptance, LLC understands that sometimes communication is not possible via telephone. To better serve our customers we ask that you sign this authorization to electronically transmit confidential information to you and/or your representative via Email, Text and/or other forms of electronic communication. This authorization will remain in effect until rescinded in writing.

Your carrier's text and data rates may apply; please review your individual plan for confirmation.

Loan / Account #: _21867_

Customer Primary email: _marybolender@gmail.com_

Secondary email: _N/A_

Service Provider for SMS/ Text: _T-Mobile_

Cell Phone Number: _702-513-9100_

Co-Customer Primary email: _____

Secondary email: _____

Service Provider for SMS/ Text: _____

Cell Phone Number: _____

Printed Name _Mary A Cobos-Bolender_

Signature _Mary A Bolender_                              Date _11/22/13_

Co-Customer Printed Name _____

Co-Customer Signature _____          Date

_____ I **do not** wish to receive any form of electronic communications from CAG Acceptance, LLC.
(Check box & Initial)

Page 4 of 4
November 21, 2013
21867-1

# EXHIBIT 5





# Kelley Blue Book

**BLUE BOOK** — OFFICIAL GUIDE

## OLDER CAR GUIDE
### 1993 – 2006 Models

| Vol. 87 | May—August 2013 | No. 8 |

LEE KELLEY · · · · · · · · · · · · · · · · · · · · · · Founder
BRAD PICKETT · · · · · · · · · · · · · · Director, Industry Products
KELLY J. SALMAN · · · · · · · · · · · · · · Director, Publications
AL SCHOGGFER · · · · · · · · · · Manager, Vehicle Valuation
ALEX PARK · · · · · · · · · · · · · · · · · · · Senior Analyst
MARTIN C. SANCHEZ · · · · · · · · · · · · · · Senior Analyst
SEAN STOTT · · · · · · · · · · · · · · · · · · · Senior Analyst

Copyright © 2013 by Kelley Blue Book Co., all rights reserved. Printed in U.S.A. Any reproduction, transmission, or storage of the contents of this publication, in whole or in part, by any means, is strictly prohibited without the express written consent of the publisher.

Kelley Blue Book Auto Market Report (ISSN 0162-1602) is published monthly, except 3 issues in January, 2 issues in May, July and September and 1 issue in February, March, April, June, August, October, November and December. TOTAL 17 issues per year for each year (as issued, by Kelley Blue Book Co., 195 Technology Dr., Irvine, CA 92618. Periodicals Postage Paid at Irvine, CA, and at additional mailing offices. POSTMASTER: Send address changes to Kelley Blue Book Auto Market Report, P.O. Box 19691, Irvine, CA 92623.

*Published at:*
195 Technology Dr., Irvine, California 92618
(949) 770-7704 or (800) BLUE-BOOK
www.800bluebook.com
We assume no responsibility for errors or omissions.

## Official Guide Since 1926

## INFORMATION AND EXPLANATION

These values are the opinion of the staff and management of Kelley Blue Book and are arrived at after careful study of information we deem reliable. However, we assume no responsibility for errors or omissions.

**LIST PRICES** represent the original suggested retail price (including destination charges) for vehicles equipped as indicated on the equipment chart.

**AUCTION VALUE** is what a vehicle is expected to sell for at wholesale auction. The Auction Value assumes the seller has properly disclosed the condition of the vehicle (including flood or frame damage). It does not include buyer's fees or the buyer's transportation costs and assumes the vehicle has not yet been fully reconditioned, inspected and prepared for retail sale.

**LENDING VALUE** is a trusted benchmark value for wholesale and retail lenders. Based in Kelley Blue Book's Auction Value, the Lending Value assumes that the vehicle is in good to excellent condition, fully reconditioned, inspected and prepared for retail sale.

**SUGGESTED RETAIL VALUE** represents dealers' asking price and is the starting point for negotiation. This value assumes that the vehicle has been fully reconditioned and has a clean title history.

**EQUIPMENT SCHEDULES** are provided for cars on pages 9 through 35 and for trucks/vans on pages 506 through 507. To the right of each model heading is the schedule that particular model should use. Base prices for all models include the equipment as indicated by asterisks on the equipment charts plus AM/FM. Any equipment following a model listing will supersede equipment listed on a chart.

Values to be deducted are enclosed in parentheses.

Add or subtract for each item that is listed separately even if it is part of a package you have already added for, or if it is original standard equipment.

**Premium Sound** refers to a complete upgraded sound system (i.e. Bose, JBL, Infinity) not simply speakers or an equalizer.

**Premium Wheels** are a special or upgraded set of wheels, not just a set of alloy wheels. This would be used for custom, designer or chromed alloy wheels. Add for either but not both.

**Navigation System** applies to a built-in dashboard or console-mounted global positioning system.

**Rear Spoiler** (factory type) bolt-on trunk-mounted spoilers. It does not apply to "Lip Spoilers" that are merely a raised contour in the trunk lid.

## INFORMATION AND EXPLANATION

**RETAIL MARK-UP FOR EQUIPMENT** is as follows:

| W/S | RTL | W/S | RTL | W/S | RTL | W/S | RTL | W/S | RTL |
|-----|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 25 | 35 | 225 | 300 | 425 | 565 | 625 | 835 | 825 | 1100 |
| 50 | 65 | 250 | 335 | 450 | 600 | 650 | 865 | 850 | 1135 |
| 75 | 100 | 275 | 365 | 475 | 635 | 675 | 900 | 875 | 1165 |
| 100 | 135 | 300 | 400 | 500 | 665 | 700 | 935 | 900 | 1200 |
| 125 | 165 | 325 | 435 | 525 | 700 | 725 | 965 | 925 | 1235 |
| 150 | 200 | 350 | 465 | 550 | 735 | 750 | 1000 | 950 | 1265 |
| 175 | 235 | 375 | 500 | 575 | 765 | 775 | 1035 | 975 | 1300 |
| 200 | 265 | 400 | 535 | 600 | 800 | 800 | 1065 | 1000 | 1335 |

**MILEAGE ADJUSTMENT SCHEDULES** appear on pages 8 through 34. These give an amount to be added or deducted from the wholesale and retail values for what we consider to be low or excess mileage. The mileage charts are not established by average miles driven per year. Instead the actual retail acceptable mileage is demonstrated by the market. The mileage adjustment is the same for wholesale and suggested retail.

Use the base lending value (excluding equipment) to determine which column on the chart to use. Disregard the rightmost three digits of the vehicle's mileage when determining the adjustment. The rightmost column gives percentages, instead of dollar amounts, for higher priced vehicles. The percentages should be applied to the base wholesale book value (excluding equipment). The result should be rounded to the nearest $25.

Regardless of the amount of equipment or mileage adjustments, the wholesale and retail values should not be reduced below 60% of the base values.

**CONDITION is of prime importance!** Remember the lending value in the guide refers to a clean vehicle ready for resale. Appropriate amounts should be deducted for any needed reconditioning. Likewise, appropriate amounts should be added for exceptionally clean vehicles, vehicles with extremely low miles and vehicles which are under warranty by the factory or dealer.

Vehicles that have been completely restored are worth a great deal more than the values shown in this guide. This publication makes no attempt to value these vehicles.

4

5

## 2005 MILEAGE CHART

BASE WHOLESALE BLUE BOOK DOLLAR VALUE

| Miles /1000 | $0-2000 | 2001-3000 | 3001-4000 | 4001-5000 | 5001-6000 | 6001-7000 | 7001-8000 | 9001 & up |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |
| 36 | 450 | 1425 | 2000 | 2575 | 3150 | 3700 | 4075 | 37.5% |
| 45 | 775 | 1375 | 1900 | 2325 | | | 4075 | 51.4% |
| 52 | 675 | 1225 | 1650 | 2050 | 2500 | 2850 | 3425 | 43.4% |
| 60 | 500 | 1000 | 1400 | 1800 | 2200 | 2600 | 3200 | 35.8% |
| 67 | 400 | 860 | 1175 | 1525 | 1900 | 2260 | 2700 | 33.4% |
| 74 | 400 | 675 | 950 | 1225 | 1500 | 1775 | 2200 | 27.4% |
| 80 | 325 | 550 | 775 | 1000 | 1225 | 1450 | 1775 | 17.5% |
| 85 | 250 | 425 | 600 | 775 | 950 | 1125 | 1400 | 17.5% |
| 90 | 200 | 325 | 475 | 600 | 725 | 875 | 1075 | 11.5% |
| 94 | 150 | 250 | 350 | 450 | 550 | 650 | 800 | 7.0% |
| 98 | 100 | 175 | 250 | 325 | 400 | 450 | 425 | |
| 100 | 75 | 125 | 175 | 225 | 300 | 375 | 350 | 4.3% |
| 101 | 50 | 75 | 125 | 150 | 200 | 275 | 275 | 2.5% |
| 102 | 50 | 50 | 75 | 100 | 150 | 200 | 125 | 2.5% |
| 103 | 25 | 50 | | 100 | 100 | 100 | 125 | |
| 104 | 25 | 50 | 50 | 50 | 50 | 50 | 75 | 0.8% |
| 105 | 0 | 25 | 25 | 25 | 25 | | | |
| 106 | 0 | 0 | 0 | 0 | 50 | 50 | 0 | 0.0% |
| 107 | 0 | 25 | 25 | 25 | 50 | 50 | 50 | 0.8% |
| 108 | 25 | 25 | 50 | 75 | 75 | 100 | 125 | 1.5% |
| 109 | 25 | 50 | 75 | 100 | 125 | 150 | 175 | 2.3% |
| 110 | 50 | 75 | 100 | 150 | 175 | 200 | 250 | 3.1% |
| 111 | 50 | 100 | 125 | 175 | 225 | 250 | 300 | 3.8% |
| 112 | 75 | 125 | 175 | 200 | 250 | 300 | 375 | 4.7% |
| 113 | 75 | 125 | 200 | 250 | 300 | 350 | 425 | 6.4% |
| 115 | 100 | 175 | 250 | 300 | 375 | 450 | 550 | 6.8% |
| 117 | 125 | 200 | 275 | 375 | 450 | 525 | 650 | 8.7% |
| 118 | 150 | 225 | 325 | 425 | 525 | 600 | 750 | 6.4% |
| 120 | 175 | 300 | 400 | 525 | 650 | 750 | 925 | 11.7% |
| 125 | 225 | 350 | 500 | 650 | 775 | 925 | 1150 | 14.3% |
| 131 | 275 | 450 | 650 | 825 | 1025 | 1200 | 1475 | 18.4% |
| 137 | 375 | 600 | 850 | 1100 | 1325 | 1575 | 1950 | 24.1% |
| 143 | 425 | 700 | 975 | 1250 | 1525 | 1800 | 2225 | 27.4% |
| 150 | 450 | 750 | 1050 | 1350 | 1650 | 1950 | 2400 | 30.1% |

32    ADD figures in shaded areas. DEDUCT figures in white areas.

## 2005 WHOLESALE FACTORY EQUIPMENT

| Equipment | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|
| Premium Sound | 100 | 100 | 50 | 90 | 50 | 50 |
| Video/DVD | 250 | 200 | 200 | 200 | 250 | 200 |
| Navigation System | 250 | 250 | 250 | 250 | 250 | 250 |
| Leather | 5 | 5 | 175 | 175 | 175 | 175 |
| Panorama Roof | 900 | | | | | |
| Rear Spoiler | 25 | 25 | | | | |
| Parking Sensors | 175 | 125 | 75 | 25 | 25 | 25 |
| Backup Camera | 200 | 200 | 200 | | | |
| Alloy Wheels | 5 | 5 | 75 | | | |
| Premium Wheels | 250 | 250 | 175 | 50 | 25 | |
| Premium Whls 18"+ | 450 | 250 | 175 | 175 | 125 | 75 |
| Roof Rack (Wagon) | 25 | 250 | 450 | 450 | 450 | 450 |
| Third Seat (Wagon) | 350 | 175 | 175 | 175 | 125 | 125 |
| **DEDUCT FOR:** | | | | | | |
| w/o ABS | — | — | (75) | (25) | (100) | (25) |
| w/o Power Windows | — | — | — | — | (100) | |
| w/o Power Locks | — | — | — | — | (25) | |
| w/o Tilt Wheel | — | — | — | — | (75) | |
| w/o Leather | (175) | (175) | — | — | — | |

★ EQUIPMENT INCLUDED IN BASE PRICE

SEE PAGE 5 FOR EQUIPMENT RETAIL          33