KEVIN R. STOLWORTHY, ESQ.
Nevada Bar No. 2798
TRACY A. DIFILLIPPO, ESQ.
Nevada Bar No. 7676
CONOR P. FLYNN, ESQ.
Nevada Bar No. 11569
BRANDON P. JOHANSSON
Nevada Bar No. 12003
ARMSTRONG TEASDALE LLP
3770 Howard Hughes Parkway, Suite 200
Las Vegas, Nevada 89169
Telephone:  702.678.5070
Facsimile:  702.878.9995
kstolworthy@armstrongteasdale.com
tdifillippo@armstrongteasdale.com
cflynn@armstrongteasdale.com
bjohansson@armstrongteasdale.com

EDWIN D. FLEMING, ESQ. (*Pro Hac Vice To Be Submitted*)
JAKE D. CURTIS, ESQ. (*Pro Hac Vice To Be Submitted*)
BURCH & CRACCHIOLO, P.A.
702 E. Osborn Rd., Suite 200
Phoenix, AZ 85014
Telephone: 602.274.7611
Facsimile: 602.850.9760
efleming@bcattorneys.com
jcurtis@bcattorneys.com

ATTORNEYS FOR DEFENDANT
CAG ACCEPTANCE, LLC

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| MARY GIBBS-BOLENDER,<br><br>Plaintiff,<br><br>vs.<br><br>CAG ACCEPTANCE, LLC, a foreign limited liability company; DOES I through X, inclusive; and ROES 1 through 10, inclusive,<br><br>Defendants. | No.: 2:14-cv-01684-APG-GWF<br><br>**DEFENDANT'S MOTION TO DISMISS TO COMPEL ARBITRATION, OR ALTERNATIVELY, TO STAY PROCEEDINGS PENDING ARBITRATION** |

Defendant CAG Acceptance, LLC ("Defendant or "CAG"), by and through its attorneys of record, Armstrong Teasdale, LLP and Burch & Cracchiolo, P.A., hereby moves pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the Complaint and to compel arbitration, or alternatively, to stay proceedings pending arbitration pursuant to 9 U.S.C. § 3.

## I.

## INTRODUCTION

To put it simply, this case does not belong in Court.  Indeed, on September 6, 2014, Plaintiff Mary Gibbs-Bolender ("Gibbs-Bolender") entered into a binding arbitration agreement.  It is well-established that parties are free to contract and enter into arbitration agreements.  The Supreme Court has held that any state law prohibiting arbitration agreements would conflict with, and therefore violate, the Federal Arbitration Act ("FAA").  *See, e.g.*, *Marmet Health Care Center, Inc. v. Brown*, 132 S.Ct. 1201, 1203-04 (2012).  Courts routinely hold that arbitration is a favored forum, and that arbitration agreements must be liberally construed.  *See, e.g., AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1745 (2011).  As set forth below, because Gibbs-Bolender executed a binding arbitration agreement, this Court should dismiss this case and compel Gibbs-Bolender to arbitrate her claims, or alternatively, stay this case pending resolution of arbitration.

## II.

## BACKGROUND

## A.

## Gibbs-Bolender's Class Action Complaint

On September 10, 2014, Gibbs-Bolender (hereinafter "Gibbs-Bolender") filed a Class Action Complaint (the "Complaint") in the Eighth Judicial District Court of the State of Nevada, styled *Mary Gibbs-Bolender v. CAG Acceptance, LLC* and bearing Case No. A-14-706754-B.  CAG timely removed the case to this Court on October 14, 2014.   *See* Clerk's Docket # 1.

In the Complaint, Gibbs-Bolender states that on September 6, 2013, she purchased a 2005 Chrysler Town & Country at the Chapman Chrysler Jeep dealership located at 930 Auto Show Dr., Henderson, NV (the "Chapman Henderson Dealership").  *See* Complaint ¶¶ 12-13.  In order to purchase the vehicle, Gibbs-Bolender entered into a Simple Interest Vehicle Contract and Security Agreement dated September 6, 2013.  *Id.* at ¶ 13.  Prior to

"driving the car off of the lot," a PassTime GPS device[1] was installed on Gibbs-Bolender's vehicle. *Id.* at ¶¶ 1, 17.

Through her Complaint, Gibbs-Bolender seeks to represent a Class of plaintiffs consisting of "all individuals who purchased a vehicle on credit in the State of Nevada within 4 years prior to the date of the filing of this Complaint, pursuant to a Retail Installment Sales Contract that was assigned to Defendant, and which vehicle was equipped with any device allowing Defendant to remotely disable it, and with terms or asserted rights contrary to those stated in the Retail Installment Sales Contract required by NRS Chapter 97." *See* Complaint ¶ 35.  Gibbs-Bolender also seeks to represent Subclass A (the "Subclass") of plaintiffs who seek "damages as a result of having additionally experienced disablement of their vehicle by Defendant for non-payment prior to being in default for non-payment as defined by the RISC as required by law." *Id.*

Gibbs-Bolender, through herself and on behalf of the putative Class and putative Subclass, alleges the following claims/violations:  (1) for all Classes, violations of "NRS 97.301, NRS 97.299, and NAC 97.050" for issuing Operating Instructions which "fail[] to provide a 30-day grace period before a buyer is in default for nonpayment[;]"  (2)  for all Classes, violations of NRS 104.9609 for on three different occasions "disabling Plaintiff's vehicle prior to default for nonpayment[;]" (3) for the Subclass, trespass to chattels for improperly "remotely disabling" vehicles; (4) for all Classes, violations of NRS 97.165, the "single document rule", for issuing a "separate document" named "Operation Instructions" at the time of a vehicle purchase; (5) for all Classes, violations of "NRS 104.1304 and NRS 104.9609" for wrongfully disabling vehicles; (6) for all Classes, violations of NRS 598.0923(3) for engaging in a deceptive trade practice for knowingly violating NRS Chapter 97, NAC Chapter 97, NRS 104.1304, and NRS 104.9609; (7) for all Classes, anticipatory

---

[1] The PassTime GPS device can perform two main functions: (1) it can track the location of a vehicle and (2) it can contain starter interrupt technology which can interrupt the starter signal following a delinquent payment.  Gibbs-Bolender alleges that CAG improperly used the starter interrupt technology and "remotely disabled" her vehicle on three different occasions in March, April and June, 2014.  *See* Complaint ¶¶ 23-30.

breach of contract for repudiating the contract "by changing the 30-day past due period of default for nonpayment agreed to in the contract, and instead stating a 2-day past due period through the Operation Instructions . . ."; and (8) for all Classes, breach of the implied covenant of good faith and fair dealing for not dealing in good faith.  *See* Complaint, ¶¶ 44, 48, 58, 70, 80-81, 85-86, 97-98, 107, 112.

## B.

## Gibbs-Bolender Enters Into A Binding Arbitration Agreement

### i.

### August 3rd Arbitration Agreement

Gibbs-Bolender's Complaint fails to note that prior to purchasing the 2005 Chrysler Town & Country, she agreed to purchase a 2008 Dodge Caravan from the Chapman Henderson Dealership.  *See* Tommy L. Smith Decl. ("Decl. of T. Smith) at ¶ 7.   Indeed, on August 3, 2013, Gibbs-Bolender executed a Simple Interest Vehicle Contract and Security Agreement (the "August 3rd RISC") for a 2008 Dodge Caravan.  *See* **Exhibit "1."**

At the time she agreed to purchase the 2008 Dodge Caravan, Gibbs-Bolender executed a Waiver of Purchaser's Right to Sue Arbitration Agreement (the "August 3rd Arbitration Agreement").  *See* **Exhibit "2."**   The August 3rd Arbitration Agreement is contained on a single page, and clearly evidences an intent to resolve claims and disputes relating to the purchase and financing of the vehicle through arbitration.  *Id*.   Indeed, the August 3rd Arbitration Agreement states, in part, as follows:

> Any claim or dispute, whether in contract, tort or otherwise (including the interpretation and scope of this clause and the arbitrability of any issue), between you and us or our employees, agents, successors or assigns, which arises out of or relates in any manner to the purchase and financing of your vehicle or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at your or our election (or the election of any such third party), be resolved by neutral, binding arbitration and not by a court action.  Any claim or dispute is to be arbitrated on an individual basis and not as a class action.  **You expressly waive any right you may have to arbitrate a class action (this is called the "class action" waiver" below).**  You may choose the applicable rules of either the American Arbitration Association (1-800-778-7879) or another arbitration organization that you select, provided we approve such organization.  We waive the right to require you to arbitrate an individual (as opposed to a class) claim if the amount you seek to recover, including attorneys' fees and expenses, is less than $2,500.

You may obtain a copy of the rules of these organizations by calling the numbers indicated or by visiting their websites.

*Id*. (emphasis in the original). Mr. Smith's signature is contained on the August 3rd Arbitration Agreement. Decl. of T. Smith at ¶ 9.

### ii.

### August 13th Arbitration Agreement

Because financing was not completed, the agreement to purchase the 2008 Dodge Caravan fell through shortly after August 3, 2014. *Id*. at ¶ 10. Contracts are often executed with automotive dealers pending the completion of financing. *Id*. at ¶ 11. Because financing may not be completed for a variety of different reasons, the purchase of the vehicle is not finalized despite a contract being executed. *Id*. at ¶ 12.

Needing a vehicle, Gibbs-Bolender agreed to purchase a 2005 Chrysler Town & Country after the 2008 Dodge Caravan deal fell through. *Id*. at ¶ 13. Indeed, on August 13, 2013, Gibbs-Bolender executed a Simple Interest Vehicle Contract and Security Agreement (the "August 13th RISC") for the 2005 Chrysler Town & Country. *See* **Exhibit "3."** At the time she agreed to purchase the 2005 Town & Country, Gibbs-Bolender executed a second Waiver of Purchaser's Right to Sue Arbitration Agreement (the "August 13th Arbitration Agreement"). *See* **Exhibit "4."** The August 13th Arbitration Agreement is substantively identical to the August 3rd Arbitration Agreement.

In order to obtain financing, Gibbs-Bolender executed an Addendum to the August 13th RISC. Decl. of T. Smith at ¶ 15; *see also* **Exhibit "5."** . The Addendum permitted the Chapman Henderson Dealership to install a PassTime GPS device on the 2005 Town & Country. *See* Exhibit 5. The Addendum also contained an arbitration provision in which Gibbs-Bolender agreed to submit to arbitration for "[a]ny claim or dispute arising out of or related to the Contract, or any breach of the Contract[.]" *Id*.

The PassTime GPS device was installed on Gibbs-Bolender's vehicle on August 13, 2014, which was the same day she signed the August 13th RISC and August 13th Arbitration Agreement. Decl. of T. Smith at ¶ 17. Gibbs-Bolender was issued a temporary license plate

that same day, signifying that Gibbs-Bolender actually drove the car off of the lot on August 13, 2013. *Id*.

### iii.

### September 6th Arbitration Agreement

Due to timing issues involved with financing, Gibbs-Bolender was required to return to the dealership and sign a third Simple Interest Vehicle Contract and Security Agreement (the "September 6th RISC").   *See* Decl. of T. Smith at ¶ 19; *see also* **Exhibit "6."**

The September 6th RISC is identical to the August 13th RISC in all material respects. For example, the vehicle being purchased did not change (the same Vehicle Identification Number is listed on both contracts), and the finance terms did not change. *Compare* Exhibit 3 *with* Exhibit 6.  The only discernable difference between the two contracts relates to the payment due date.   *Id*.   Under the August 13th RISC, the first payment was due on September 27, 2013. *Id*.  Under the September 6th RISC, the first payment was not due until October 21, 2013. *Id*.

As with the prior two RISC's, Gibbs-Bolender executed a third Waiver of Purchaser's Right to Sue Arbitration Agreement (the "September 6th Arbitration Agreement").  *See* **Exhibit "7."**  The September 6th Arbitration Agreement is substantively identical to the August 3rd and August 13th Arbitration Agreements.  Mr. Smith's signature is contained on the September 6th Arbitration Agreement.  Decl. of T. Smith at ¶ 21.

The September 6th Arbitration Agreement, which was the last arbitration agreement executed in conjunction with the September 6th RISC, is the agreement sought to be enforced in this Motion.

### C.

### CAG Was Assigned The RISC

CAG ultimately provided the financing for Gibbs-Bolender's 2005 Chrysler Town & Country.  *Id*. at ¶ 22.  As part of the financing, CAG was assigned the rights to the Gibbs-Bolender contract from the Chapman Henderson Dealership.  *Id*.

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.

### <u>LEGAL STANDARD FOR ARBITRATION</u>

Defendant moves to dismiss and compel arbitration pursuant to Fed. R. Civ. P. 12(b)(6), or in the alternative, to stay proceedings pending arbitration pursuant to 9 U.S.C. § 3. Under the Federal Arbitration Act ("FAA"), "[a] party to a valid arbitration agreement may 'petition any United States district court for an order directing that such arbitration proceed in the manner provided for in such agreement.'" *Lifescan, Inc. v. Premier Diabetic Services, Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004) (alterations omitted) (quoting 9 U.S.C. § 4). The Ninth Circuit has noted that "[a]rbitration provides a forum for resolving disputes more expeditiously and with greater flexibility than litigation." *Id.* at 1011. "Arbitration is a matter of contract." *Id.* at 1011-12 (alterations and citation omitted). "Congress crafted the FAA to 'overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and place such agreements upon the same footing as other contracts.'" *Id.* at 1012 (alterations and citation omitted).

The Ninth Circuit commented in 2013 that "[r]ecent opinions of the Supreme Court have given broad effect to arbitration agreements." *Kilgore v. KeyBank, Nat'l Ass'n*, 718 F.3d 1052, 1057 (9th Cir. 2013) (en banc). "The basic role for courts under the FAA is to determine '(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue.'" *Id.* at 1058 (citation omitted).

9 U.S.C. § 2, "the primary substantive provision of the [FAA]," *see AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1745 (2011) (citation omitted), provides in relevant part that "arbitration agreements are 'enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Kilgore*, 718 F.3d at 1058. The Supreme Court has "described this provision as reflecting both a 'liberal federal policy favoring arbitration,' and the 'fundamental principle that arbitration is a matter of contract[.]'" *Concepcion*, 131 S.Ct. at 1745 (citations omitted). "In line with these principles, courts must place arbitration agreements on an equal footing with other contracts, and enforce them according to their terms[.]" *Id.* at 1745-46 (citations omitted). The final phrase of § 2, the savings clause,

permits agreements to arbitrate to be invalidated by "generally applicable contract defenses, such as fraud, duress, or unconscionability," but not by "defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Id*. at 1746 (citations omitted).

## IV.

## ARGUMENT

### A.

### Gibbs-Bolender Expressly Agreed To Arbitration

"When determining whether a valid contract to arbitrate exists, [this court] appl[ies] ordinary state law principles that govern contract formation." *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1093 (9th Cir. 2014). Under Nevada law, "strong public policy favors arbitration, and arbitration clauses are generally enforceable." *Gonski v. Second Jud. Dist. Ct.*, 126 Nev. Adv. Op. 51, 245 P.3d 1164, 1168 (2010). The question of whether an agreement to arbitrate exists is one of fact. *See Truck Ins. Exchange v. Palmer J. Swanson, Inc.*, 124 Nev. 629, 633, 189 P.3d 656, 659 (2008). "[P]arties to a written arbitration agreement are bound by its conditions regardless of their subjective beliefs at the time the agreement was executed." *Kindred v. Second Jud. Dist. Ct.*, 116 Nev. 405, 411, 996 P.2d 903, 907 (2000) (citation omitted).

Here, Gibbs-Bolender clearly executed the September 6th Arbitration Agreement. *See* Exhibit 7. There should be no dispute that this was an agreement to arbitrate disputes and claims, as the Arbitration Agreement notes towards the top of the page, in bold lettering and capital letters, that it is a "**WAIVER OF PURCHASER'S RIGHT TO SUE ARBITRATION AGREEMENT**." *Id.* (capital letters and bold in the original). The language of the Arbitration Agreement also notes several times that it is an "Arbitration Agreement." *Id*. The Arbitration Agreement even emphasized Gibbs-Bolender's right to opt-out after 10 business days in bold and italicized language: ""***You may opt out of your agreement to arbitrate disputes by notifying us in writing of your decision to do so and sending the notification to us at our address shown below by certified mail to the attention***

8

*of the controller within 10 business days of the date you sign this Arbitration Agreement*." *Id*. (bold and italics in the original).  Gibbs-Bolender, however, never exercised her right to opt-out.  Thus, it is clear that Gibbs-Bolender entered into a valid arbitration agreement.

It is worth noting that the Arbitration Agreement itself does not violate Nevada's single-document rule.  NRS 97.165(1), commonly referred to as the "single-document rule," provides that "[e]very retail installment contract must be contained in a single document which must contain the entire agreement of the parties[.]"  NRS 97.185 specifies the contents that must be included in the retail installment contract, and these contents include items relating to the financial terms of a sale such as "the amount of the finance charge[.]"  NRS 97.299 and NAC 97.050 require the Nevada Commissioner of Financial Institutions to prescribe forms for the retail installment contracts.   The September 6th RISC that Gibbs-Bolender signed was on a form prescribed by the Nevada Commissioner of Financial Institutions.  It contained all of the information required under NRS Chapter 97.  There is nothing in NRS 97.165(1), or any other Nevada statute for that matter, that prohibits a buyer and seller of a vehicle from entering into an arbitration agreement when executing an RISC.

However, even assuming that NRS Chapter 97, or any other Nevada statute or code, somehow prohibited buyers and sellers from entering into arbitration agreements, such prohibition would clearly be preempted by the FAA.  In *Concepcion*, the Supreme Court noted that "[w]hen state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward:  The conflicting rule is displaced by the FAA."  131 S.Ct. at 1747.  This holding was reaffirmed in *Marmet Health Care Center, Inc. v. Brown*, 132 S.Ct. 1201, 1203-04 (2012), which held that West Virginia's prohibition against "predispute agreements to arbitrate personal-injury or wrongful-death claims against nursing homes is a categorical rule prohibiting arbitration of a particular type of claim, and that rule is contrary to the terms and coverage of the FAA."  Additionally, in *Ferguson v. Corinthian Colleges, Inc.*, 733 F.3d 928, 936 (9th Cir. 2013), the Ninth Circuit noted that a federal court is "prohibited from applying any state statute that invalidates an arbitration agreement."

Accordingly, any argument that Nevada law prohibited the parties from entering into

9

a separate arbitration agreement is wholly without merit as the FAA would clearly displace any such law.

### B.

### Gibbs-Bolender Also Expressly Agreed to Arbitrate The Question of "Arbitrability"

The Ninth Circuit has held that "[a]lthough the gateway issues of arbitrability presumptively are reserved for the court, the parties may agree to delegate them to the arbitrator." *Momot v. Mastro*, 652 F.3d 982, 987 (9th Cir. 2011). "[T]he question of arbitrability is left to the court unless the parties clearly and unmistakably provide otherwise." *Id*. at 988. The terms of the agreement may establish whether issues of arbitrability are reserved for the arbitrator. *Id*. In *Momot*, the parties had agreed to the following arbitration provision which contained a "delegation clause":

> 4. *Resolution of Disputes.*
>
> (a) ***Arbitration***. If a dispute arises out of or relates to this Agreement, the relationships that result from this Agreement, the breach of this Agreement *or the validity or application of any of the provisions of this Section 4,* and, if the dispute cannot be settled through negotiation, the dispute shall be resolved exclusively by binding **arbitration**.
>
> *Id*. (emphasis in the original).

The Ninth Circuit found that "this language, delegating to the arbitrators the authority to determine 'the validity or application of any of the provisions of' the arbitration clause, constitutes an 'agreement to arbitrate threshold issues concerning the agreement.'" *Id*. (citation omitted). "In other words, the parties clearly and unmistakably agreed to arbitrate the question of arbitrability." *Id*.

Similar to *Momot*, Gibbs-Bolender agreed to a delegation clause which provided that "[a]ny claim or dispute, whether in contract, tort or otherwise ***(including the interpretation and scope of this clause and the arbitrability of any issue)*** . . . which arises out of or relates in any manner to the purchase and financing of [her] vehicle or any resulting transaction or relationship . . . ***shall, at your or our election (or the election of any such third party), be resolved by neutral, binding arbitration and not by a court action***." *See* Exhibit 7 (emphasis added).

Thus, due to operation of the delegation clause, the issue of whether the claims made by Gibbs-Bolender are subject to arbitration is an issue that is to be decided by the arbitrator, not this Court.  Additionally, whether the September 6th Arbitration Agreement, as a whole, is unenforceable, for reasons such as unconscionability, is also an issue for the arbitrator to decide. The decision in *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 (2010), a case which originated from the District of Nevada, is instructive.

In that case, the Supreme Court considered whether, under the FAA, "a district court may decide a claim that an arbitration agreement is unconscionable, where the agreement explicitly assigns that decision to the arbitrator."  *Id*. at 65.  Similar to the instant case, the arbitration agreement sought to be enforced in *Jackson* was a standalone arbitration agreement as opposed to "arbitration provisions sought to be enforced in . . . contracts unrelated to arbitration[.]"  *Id*. at 71.  The Supreme Court ultimately found that challenges to the arbitration agreement as a whole on unconscionability grounds were impermissible.  *Id*. at 72.  The Supreme Court reasoned that a party's challenge to another provision of the contract, *or to the contract as a whole*, does not prevent a court from enforcing a specific agreement to arbitrate."  *Id*. at 70. "As a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract."  *Id*. at 70-71.

Therefore, the only challenge that can properly be made in this Court to the September 6th Arbitration Agreement on grounds such as unconcionability is a challenge to the specific delegation clause granting the arbitrator authority to determine "arbitrability."

## C.

## Even Assuming An Agreement To Arbitrate The Question Of "Arbitrability" Had Not Been Made. The Claims At Issue Here Are Within The Scope Of The Arbitration Agreement

As noted above, Gibbs-Bolender agreed to arbitrate "[a]ny claim or dispute, whether in contract, tort or otherwise (including the interpretation and scope of this clause and the arbitrability of any issue) . . . *which arises out of or relates in any manner to the purchase and financing of [her] vehicle or any resulting transaction or relationship . . .*"  *See* Exhibit

7 (emphasis added).

The Nevada Supreme Court has held that an arbitration agreement containing the phrase "arising out of or relating to" constituted "the broadest language the parties could reasonably use to subject their disputes to arbitration." *State ex rel. Masto v. Second Jud. Dist. Ct.*, 125 Nev. 37, 45 n. 5, 199 P.3d 828, 833 n.5 (Nev. 2009). Along these same lines, the Ninth Circuit has held that "[e]very court that has construed the phrase 'arising in connection with' in an arbitration clause has interpreted that language broadly[,]" and therefore arbitration provisions containing the phrase "arising out of or relating to" reach "every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999). Thus, claims seeking injunctive relief and violations of state statutes may be subject to arbitration, so long as the genesis of the dispute underlying these claims has a significant relationship to the contract. *Id*. at 718, 726.

Thus, even assuming an agreement to arbitrate the question of arbitrability had not been made, it is clear that arbitration is the proper forum as Gibbs-Bolender's claims are encompassed within the scope of the arbitration agreement. To begin with, there should be no dispute that the claims for anticipatory breach of contract and breach of the implied covenant of good faith and fair dealing are covered by the September 6th Arbitration Agreements. These claims directly arise out of Gibbs-Bolender's September 6th RISC, and they relate to the purchase of her vehicle.

Additionally, the first claim for injunctive relief alleges that "Defendant breached the [September 6th RISC] required by NRS 97.301, NRS 97.299, and NAC 97.050 . . ." *See* Complaint at ¶ 48. The second claim for trespass to chattels alleges that Defendant "intermeddled with Plaintiff's chattel, i.e. the 2005 Chrysler Town & Country LX," even though she was "not in default of her obligations under the [September 6th RISC] . . ." *Id*. at ¶¶ 57-58. The third claim for violations of NRS Chapter 97 cites to the single-document rule under NRS 97.165, and alleges that Defendant improperly attempted "to vary the terms of the RISC" by creating a separate document for "Operation Instructions." *Id*. at ¶¶ 68-70.

The fourth claim alleges violations of NRS 104.305 and NRS 104.9609 on the basis that "[t]he RISC is a contract covered within the Uniform Commercial Code ["UCC"]" and Defendant violated the UCC by not acting in good faith, and by improperly disabling Gibbs-Bolender. *Id*. at ¶¶ 79-87. The fifth claim alleges a deceptive trade practice under NRS 598.0923 for violating NRS Chapter 97, NAC Chapter 97, NRS 104.1304 and 104.9609. *Id*. at ¶ 97. Thus, the fifth claim is simply derivative of the other claims. *Id*. at ¶¶ 79-87.

All of these claims and alleged violations stem from the contractual relationship created under the September 6th RISC. Therefore, the claims are clearly within the scope of the September 6th Arbitration Agreement.

## **D.**

## **The Class Action Waiver Contained In The September 6th Arbitration Agreement Does Not Render The Arbitration Agreement Unenforceable**

It is also important to note that the provisions requiring Gibbs-Bolender to arbitrate on an individual basis, and prohibiting class action arbitration, do not render the September 6th Arbitration Agreement unenforceable. Specifically, the September 6th Arbitration Agreement provides near the top of the document in bold lettering and capital letters that: "**3. IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US.**" *See* Exhibit 7 (capital letters and bold in the original). The September 6th Arbitration Agreement further provides that "Any claim or dispute is to be arbitrated on an individual basis and not as a class action[,]" and that: "**You expressly way any right you may have to arbitrate a class action (this is called the 'class action waiver" below).**" *Id*. (bold in the original).

In *Concepcion*, the Supreme Court expressly held that class action waiver provisions such as this are valid and enforceable, and that any state law rule to the contrary would be preempted by the FAA. 131 S.Ct. at 1753. In that case, the respondents argued that "California's unconscionability doctrine and California's policy against exculpation" were grounds to invalidate a class action waiver in an arbitration agreement." *Id*. at 1746.

13

However, the Supreme Court disagreed, finding that "[r]equiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." *Id*. at 1748.  The Supreme Court reasoned that "[f]irst, the switch from bilateral to class arbitration sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." *Id*. at 1751.  "Second, class arbitration *requires* procedural formality." *Id*. (emphasis in the original).  "Third, class arbitration greatly increases risks to defendants" because "[f]aced with even a small chance of a devastating loss, defendants will be pressured into settling questionable claims." *Id*. at 1752.  The Supreme Court ultimately found that "[a]rbitration is poorly suited to the higher stakes of class litigation." *Id*.

Thus, any Nevada law that would invalidate a class action waiver is preempted by the FAA.  *See, e.g., Pendergast v. Sprint Nextel Corp.*, 691 F.3d 1224, 1234 (11th Cir. 2012) (relying on *Concepcion* in holding that "[w]e need not decide whether the class action waiver here is unconscionable under Florida law . . . because to the extent Florida law would invalidate the class action waiver, it would still be preempted by the FAA.").  This means that the Nevada Supreme Court's decision in *Picardi v. Eighth Jud. Dist. Ct.*, 127 Nev. Adv. Op. 9, 251 P.3d 723 (Nev. 2011), which was issued shortly prior to *Concepcion*, is no longer valid law.

Lastly, even assuming *Concepcion* did not expressly foreclose this argument, Defendant submits that the Supreme Court's decision in *Jackson* would preclude this Court from deciding whether the class action waiver rendered the September 6th Arbitration Agreement unenforceable as the delegation clause requires the arbitrator to decide this issue, not this Court.

/ / /

/ / /

/ / /

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

Based upon the foregoing reasons, Defendant submits that the Complaint should be dismissed and that arbitration be compelled, or alternatively, that the proceedings be stayed pending resolution of arbitration.

DATED October 21, 2014.                    ARMSTRONG TEASDALE LLP


By: /s/ *Kevin R. Stolworthy*
    KEVIN R. STOLWORTHY, ESQ.
    Nevada Bar No. 2798
    TRACY A. DIFILLIPPO, ESQ.
    Nevada Bar No. 7676
    CONOR P. FLYNN, ESQ.
    Nevada Bar No. 11569
    BRANDON P. JOHANSSON
    Nevada Bar No. 12003
    3770 Howard Hughes Parkway, Suite 200
    Las Vegas, Nevada 89169
    kstolworthy@armstrongteasdale.com
    tdifillippo@armstrongteasdale.com
    cflynn@armstrongteasdale.com
    bjohansson@armstrongteasdale.com

    EDWIN D. FLEMING, ESQ. (Pro Hac Vice To Be Submitted)
    JAKE D. CURTIS, ESQ. (Pro Hac Vice To Be Submitted)
    BURCH & CRACCHIOLO, P.A.
    702 E. Osborn Rd., Suite 200
    Phoenix, AZ 85014
    Telephone: 602.274.7611
    Facsimile: 602.850.9760
    efleming@bcattorneys.com
    jcurtis@bcattorneys.com

    Attorneys For Defendant
    CAG Acceptance, LLC

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of October, 2014, the foregoing DEFENDANT'S MOTION TO DISMISS TO COMPEL ARBITRATION, Or ALTERNATIVELY, TO STAY PROCEEDINGS PENDING ARBITRATION served on the party(ies) ☐ via electronic service pursuant to Fed.R.Civ.P.5(b), and Section IV of District of Nevada Electronic Filing Procedures and/or ☒ by mailing a copy thereof, first class mail, postage prepaid, to:

Dan L. Wulz, Esq.
Sophia A. Medina, Esq.
LEGAL AID CENTER OF SOUTHERN NEVADA, INC.
725 E. Charleston Blvd.
Las Vegas, NV 89104
Tel: 702-386-1070, ext. 1453
Fax: 702-386-1453
dwulz@lacsn.org
smedina@lacsn.org

Attorneys for Class

J. Randall Jones, Esq.
Carol L. Harris, Esq.
KEMP, JONES & COULTHARD, LLP
3800 Howard Hughes Pkwy., 17th Floor
Las Vegas, NV 89169
Tel: 702-385-6000
Fax: 702-385-6001
jrj@kempjones.com
c.harris@kempjones.com

Attorneys for Class


/s/*Reina Fortin*
An employee of Armstrong Teasdale LLP