DAN L. WULZ, ESQ.
Nevada Bar No.: 5557
SOPHIA A. MEDINA, ESQ.
Nevada Bar No.: 12446
**LEGAL AID CENTER OF
SOUTHERN NEVADA, INC.**
725 E. Charleston Blvd.
Las Vegas, NV  89104
Telephone: (702) 386-1070 x 1453
Facsimile: (702) 386-1453
smedina@lacsn.org

J. RANDALL JONES, ESQ.
Nevada Bar No.: 1927
CAROL L. HARRIS, ESQ.
Nevada Bar No.: 10069
**KEMP, JONES & COULTHARD, LLP**
3800 Howard Hughes Pkwy, 17th Floor
Las Vegas, Nevada 89169
Telephone: (702) 385-6000
Facsimile: (702) 385-6001
c.harris@kempjones.com
*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| MARY GIBBS-BOLENDER,<br>Plaintiff,<br><br>vs.<br><br>CAG ACCEPTANCE, LLC, a foreign limited liability company; DOES I through X, inclusive;<br>and ROES 1 through 10, inclusive,<br>Defendants. | Case No.: 2:14-cv-01684-APG-GWF<br><br>Dept. No:<br><br>**Plaintiff's Response to Defendant's Motion to Dismiss to Compel Arbitration or, Alternatively, to Stay Proceedings Pending Arbitration**<br><br>**(Oral Argument Requested)** |

Plaintiff, MARY GIBBS-BOLENDER, individually and on behalf of all others similarly situated ("Gibbs-Bolender"), by and through counsel, Dan L. Wulz, Esq., and Sophia A. Medina, Esq., of Legal Aid Center of Southern Nevada, Inc., and J. Randall Jones, Esq., and Carol L.

Harris, Esq., of Kemp, Jones & Coulthard, LLP, hereby files this Response to Defendant's Motion to Compel Arbitration, or Alternatively, to Stay Proceedings Pending Arbitration. This Response is made pursuant to FRCP 12(b)(6), based upon the following Memorandum of Points and Authorities, as well as the pleadings and papers on file herein, and any oral argument the court may allow at the time of hearing.

<u>**Memorandum of Points and Authorities**</u>

**I.      Introduction**

In the process of purchasing a vehicle on credit from Chapman Chrysler Jeep, which was eventually memorialized in a retail installment contract as required by NRS Chapter 97, Plaintiff and proposed Class Representative Mary Gibbs-Bolender signed multiple documents on three different dates. Unbeknownst to her, it appears one of those documents was an arbitration agreement. Chapman later assigned the retail installment contract to Defendant CAG Acceptance, LLC. CAG moves this Court to dismiss Gibbs-Bolender's Complaint and compel her to arbitrate her claims, arguing that the arbitration agreement must be enforced under the federal preference for arbitration.

CAG's argument is misplaced. The issue before the Court is not the federal preference for arbitration, but what Nevada law requires *generally* in installment sales contracts for motor vehicles. As a measure of consumer protection, Nevada law does not recognize any agreement or term—arbitration or otherwise—that is not included within the four corners of the retail installment contract. The arbitration agreement CAG seeks to enforce is a stand-alone document. No portion of that agreement is contained within the retail installment contract. The retail installment contract, in fact, does not mention arbitration at all. Because neither the arbitration agreement itself nor any portion of it—including the delegation of issues to the arbitrator and class-arbitration ban—are actually contained in the retail installment contract, they are not valid

terms of the parties' agreement under substantive Nevada law. This Court must therefore deny CAG's motion in its entirety.

## II.        Statement of Facts

**A.        CAG misrepresents facts regarding this retail installment sales contract.**

CAG's motion is supported by the declaration of Tommy L. Smith, Chapman's finance manager. Smith states that "Because financing was not completed, the agreement to purchase the 2008 Dodge Caravan fell through shortly after August 3, 2014." Doc. 6-1 at 2, ¶ 10. Smith claims that "If financing is not completed, … the purchase of the vehicle cannot be finalized despite a contract being executed." *Id.* at 2–3, ¶ 12. Smith goes on to claim that "[i]n order to enable Gibbs-Bolender to obtain financing," she was required to sign an addendum to the RISC which allowed Chapman Henderson Dealership to install a PassTime GPS device on the vehicle. *Id.* at 3, ¶¶ 15–16. Smith concludes that "Due to timing issues involved with financing, Gibbs-Bolender was required to return to the dealership and sign [the September 6th RISC]." *Id.* at ¶ 19.

Contrary to Smith's statements, the dealer is expressly named as the "creditor" in the contract. *See* Doc. 6-7 at 2. The contract states: "we agree to sell and you agree to buy." The RISC is a consummated deal for the purposes of the Truth In Lending Act ("TILA") and TILA disclosures are given. The only way a dealer can avoid its obligations under the contract as made is to exercise a contractual option to cancel. The contract specifically states in the paragraph labeled "Notice of Rescission Rights (Option to Cancel)":

> 2) You acknowledge that it may take a few days for the Seller to verify your credit and assign the contract. In consideration of the Seller agreeing to deliver the vehicle, you agree that if the Seller is unable to assign the contract to a Financial Institution with whom the Seller regularly does business pursuant to terms of assignment acceptable to the Seller, the Seller may elect to rescind the contract.  3) If the Seller elects to rescind the contract, the Seller shall, within 20 days after the date of the contract, give you notice of the rescission. . . . The Seller agrees, upon rescission of the

> contract, to restore to you all consideration received in connection with the contract, including any trade-in vehicle.

Doc. 6-7 at 4.

If, in exercising its contractual option to cancel, the dealer wishes to sell the same car on different terms, or sell another car, then it must follow statutory requirements and must use the disclosure form as required by NRS 482.554(3) and NAC 482.935.[1] Failure to follow the required cancellation steps is a deceptive trade practice under NRS 482.554. Nevada's law and the terms of the Gibbs-Bolender–Chapman installment contract thus set this action apart from cases where financing is a condition precedent to consummating the sale.

The financing runaround Smith describes in his declaration is a well-known deceptive trade practice in the industry commonly referred to as "yo-yo sales" or "spot-delivery."[2] In this practice, a dealer will sell a vehicle and allow the buyer to take the vehicle "on the spot," only to back out of the deal days or even weeks later because "financing has fallen through." The dealer then yo-yos the buyer back to the dealership—keeping them on a string—requiring the buyer to bring the vehicle back and then presents the buyer with a new sales contract, often with less favorable terms—as in this case where Gibbs-Bolender was required to sign an addendum "in order to obtain financing." Doc. 6-1 at 3 ¶ 15. These yo-yo sales practices prey on the buyer's ignorance about the dealer's role in the transaction and the relationship of the dealer with an intended assignee bank or finance company. In the retail installment sales contract required under Nevada law, it is the dealer that originally extends credit, and the bank or finance company is simply an assignee of the dealer.

---

[1] *See* example Disclosure Form, OBL315, attached as **Exhibit 1**.

[2] *See* National Consumer Law Center, Automobile Fraud 97–99 (4th ed. 2011), attached as **Exhibit 2**.

The statements under oath of Chapman's finance manager reveal a fundamental misunderstanding of the terms of the contract and the laws under which he and the dealership operate. If Smith makes representations to consumers based on those beliefs, he is knowingly misrepresenting the legal rights, obligations, and remedies of a party to a transaction, which itself is a Deceptive Trade Practice in violation of NRS 598.092(8), and knowingly making false representations in a transaction in violation of NRS 598.0915(15).

Finally, it is disingenuous for Smith to represent that "[i]n order to enable Gibbs-Bolender to obtain financing," she had to sign an addendum to the RISC which allowed Chapman to install a PassTime GPS device on the vehicle. Doc. 6-1 at ¶ 15-16. Installing a GPS device was never bargained for in this transaction, and never discussed as a prerequisite to sale or in setting any terms.[3]

**B.      Well pleaded facts in the Complaint.**

Mary Gibbs-Bolender is a single mother of three: two 15-year olds and one 10-year old. Her 10-year old child is chronically ill with asthma and eczema that causes a low immune system and recently suffered the loss of her father. Mary is unable to work because of the amount of doctor's and counseling appointments that her child needs.

On September 6, 2013, Gibbs-Bolender went to Chapman Chrysler Jeep, located on 930 Auto Show Drive, Henderson, NV, 89014, in order to purchase a vehicle for personal use to take her chronically ill child to regular trips to the doctor.

Gibbs-Bolender decided to purchase, on credit, a used, 2005 Chrysler Town & Country LX, VIN 2C4GP44R85R469523 (hereinafter "the vehicle") for a total sales price of $12,579.89. Chapman Chrysler Jeep prepared a "Simple Interest Vehicle Contract and Security Agreement"

---

[3] *See* Affidavit of Mary Gibbs-Bolender, attached as **Exhibit** 3; *accord* Doc. 1-3 at 8–12, ¶¶ 10–33.

dated September 6, 2013, also known as a NRS Chapter 97 Retail Installment Sales Contract. Doc. 6-7 at 2–5. The installment contract identifies Chapman Chrysler Jeep as the creditor, states a down payment of $1,000.00, paid in cash, leaving $11,579.89 as the "Amount Financed" with $5,944.46 as the "Finance Charge." The installment contract provides "Your payment schedule will be:" 45 monthly payments of $389.43 beginning October 21, 2013. The installment contract, as required under NRS 97.301, NRS 97.299, and NAC 97.050, defines default for nonpayment as the failure to make a payment later than 30 days past the due date required by the agreement.

While purchasing the vehicle, the salesperson did not inform Gibbs-Bolender about any GPS device on her vehicle. A GPS device was first mentioned while Gibbs-Bolender was signing all the sales documents after she paid her down payment. As Gibbs-Bolender was driving the car off of the lot, the salesperson placed the GPS documents and associated DVD into her glove box and stated "everything you need to know is on the DVD." On September 12, 2013, after being assigned the installment contract, CAG sent a "welcome letter" incorrectly stating that CAG was her "loan servicer" and how to make payments. The letter did not discuss the "Passtime Elite GPS" device on the vehicle. Gibbs-Bolender made her first payment, October 21, 2013 on time.

In October 2013, prior to the second payment's due date, Gibbs-Bolender moved to a new address due to issues in her daughter's school. Additionally in October, 2013, Gibbs-Bolender's medical insurance company, NV Check Up, had closed and shifted to Medicaid. In the transition period between NV Check Up and Medicaid, Gibbs-Bolender was forced to pay out of pocket for her daughter's prescriptions. Because of the added moving and medical expenses, Gibbs-Bolender contacted CAG to let it know she would be unable to make the second payment (November 21, 2013) on time.

When Gibbs-Bolender notified CAG of her difficulties making the November payment, the parties negotiated for her payments to be due on the first of each month rather than the 21st of each month. So at that point, Gibbs-Bolender's next payment would be due December 1, 2013. Plaintiff was able to make the December 2013 and January and February 2014 payments in full and on time.

On March 11, 2014, CAG contacted Gibbs-Bolender to inform her that her check for the March 1, 2014 payment had been dishonored. Despite explaining her situation, CAG remotely disabled Gibbs-Bolender's vehicle for non-payment on March 11, 2014, **_20_** days prior to default for non-payment as defined in the installment contract. Because her vehicle had been disabled, Gibbs-Bolender was unable to drive her child to the hospital on March 14, 2014 and had to cancel her 10-year old child's scheduled doctor's appointments.

On March 19, 2014, Gibbs-Bolender brought her account current for the month and CAG reactivated her vehicle—Gibbs-Bolender lost 9 days of use of the vehicle. On or about April 1, 2014, Gibbs-Bolender contacted CAG and notified it that she would only be able to make a partial payment for April. CAG agreed and allowed her to make a partial payment on April 1 and pay the remainder on April 16 with an additional $4.00 charged to her card for each payment. CAG's employee, David, told Gibbs-Bolender that this would be the only time that they allow her to make a partial payment. Gibbs-Bolender set her account to automatically charge the payment to her credit card on April 16, 2014.

On April 16, 2014, **_15_** days prior to default for non-payment as defined in the installment contract, CAG remotely disabled the vehicle for non-payment. When Gibbs-Bolender contacted CAG and demanded her vehicle to be restarted, CAG attempted to charge Gibbs-Bolender $10.00 rather than the $4.00 agreed to on April 1, 2014. After asking why she needed to pay $10 rather than the agreed $4.00, CAG's employee stated "to teach customers a lesson for bouncing a

check." Gibbs-Bolender was able to get CAG to start her vehicle after a phone conversation that lasted more than an hour. Because CAG disabled Gibbs-Bolender's vehicle for over an hour for non-payment on April 16, 2014, she was unable to drive one of her 15-year old children to a scheduled doctor's appointment.

Gibbs-Bolender was unable to pay the full amount on June 1, 2014. As a CAG employee had told Gibbs-Bolender that she was not allowed to make any more partial payments, she did not attempt to do so. Consequently, CAG remotely disabled the vehicle for non-payment on June 7, 2014, **_23_** days prior to default for non-payment as defined in the installment contract. Gibbs-Bolender paid the balance on June 15, 2014, and CAG restarted the vehicle the same day—Gibbs-Bolender lost 9 days of use of the vehicle. Because CAG had remotely disabled the vehicle, Plaintiff was unable to drive her child to a scheduled doctor's appointment on June 13, 2014.

### III.    Argument

**A.    The extraneous arbitration agreement is unenforceable because it violates Nevada's single-document rule.**

> ***1.    Substantive Nevada law requires retail installment contracts to be in a single document that contains the entire agreement of the parties.***

Nevada's single-document rule is codified in NRS 97.165, which provides: "**Every retail installment contract _must_ be contained in a single document which _must_ contain the entire agreement of the parties**. . . ."[4] "[T]he requirements of NRS 97.165" must be met for contracts involving sales of vehicles where: (1) a security interest is taken to secure a portion of the purchase price; (2) the credit application "is made to or through the seller;" (3) "[t]he seller is a dealer;" and (4) "[t]he sale is not a commercial transaction."[5] These statutes are part of the

---

[4] NEV. REV. STAT. § 97.165(1) (emphasis added).

[5] NEV. REV. STAT. § 97.299(1)–(2).

Nevada Retail Installment Sales of Goods and Services Act. Nevada's act is similar to acts that were adopted by most states to protect consumers and typically require all terms of a sales contract to be contained in a single document constituting the entire agreement of the parties.[6]

The language of NRS 97.165 is plain and unambiguous: if a term is not included in the installment contract, which "must contain the entire agreement of the parties," then it is not an agreement of the parties. Nevada law thus operates to negate the very existence of an agreement that is not included in the installment contract. "'Where the language of a statue is plain and unambiguous and its meaning is clear and unmistakable, there is no room for construction, and the courts are not permitted to search for its meaning beyond the statute itself.'"[7] The Court, therefore, need look no further than the plain meaning of NRS 97.165(1) to determine that an agreement that is not included in an installment sales contract violates the statute and was not properly formed under Nevada law.[8]

### 2.  This installment contract is subject to Nevada's single-document rule.

The Gibbs-Bolender–Chapman retail installment contract at issue in this action falls within NRS 97.165 and 97.299. It cannot honestly be disputed that Chapman took a security interest in the vehicle under the terms of this contract and that this was not a commercial transaction. *See* Doc. 6-7 at 2–5; Doc. 1-3 ¶ 12 (Gibbs-Bolender went to Chapman to "purchase a

---

[6] National Consumer Law Center, *The Cost of Credit. Regulation, Preemption, and Industry Abuses* § 2.3.3.5 (3d ed. 2005); *see e.g. Kenworthy v. Bolin*, 17 Wash.App. 650, 654, 564 P.2d 835, 837–38 (1977) (providing Washington's act "requires that '[e]very retail installment contract shall be contained in a Single document which shall contain the entire agreement of the parties'"); *Rugumbwa v. Betten Motor Sales*, 136 F.Supp.2d 729, 733 (W.D. Mich. 2001) (Michigan's act requires "that "[e]very retain installment sale of a motor vehicle shall be evidence in an instrument in writing ... The written instrument shall contain all of the agreements of the parties made with reference to the subject matter of the retail installment sale").

[7] *J.D. Const. v. IBEX Intl. Group*, 126 Nev. Adv. Op. 36, 240 P.3d 1033, 1039–40 (2010) (quoting *Madera v. SIIS*, 114 Nev. 253, 257, 956 P.3d 117, 120 (1998)).

[8] *See Seput v. Lacayo*, 122 Nev. 499, 835 P.2d 1260 (2006); *Cleghorn v. Hess*, 109 Nev. 544, 853 P.2d 1260 (1993).

1   vehicle for personal use"). Chapman's status as a "dealer" likewise is not subject to dispute.

2   Nevada law defines a "dealer" as "any person who ... [f]or compensation, money or other thing

3   of value sells ... an interest in a vehicle subject to registration under this [NRS Chapter 482]. . .

4   ."[9] Smith's declaration confirms Chapman's status as a "dealership" and that it sold Gibbs-

5   Bolender a vehicle that is subject to registration under NRS Chapter 482. Doc. 6-1 ¶¶ 1, 18.

6   Smith's declaration also confirms the final element, that Gibbs-Bolender made an application for

7   credit through Chapman. *See* Doc. 6-1 ¶ 19 ("Due to timing issues involved with financing,

8   Gibbs-Bolender was required to return to the dealership and sign a third Simple Interest Vehicle

9   Contract and Security Agreement").

10          Because the Gibbs-Bolender–Chapman installment contract falls within Nevada's Retail

11   Installment Sales of Goods and Services Act, "the entire agreement must be contained within a

12   single document."[10] But the arbitration agreement CAG seeks to enforce is a stand-alone

13   document. Doc. 6-8 at 2; *accord* Doc. 6 at 06:20–23 ("The September 6th Arbitration Agreement

14   ... is the agreement sought to be enforced in this Motion."). No portion of the arbitration

15   agreement is contained within the four corners of the operative installment contract Gibbs-

16   Bolender signed on September 6, 2013. Doc. 6-7 at 2–4. The installment contract, in fact, does

17   not mention arbitration at all. *Id.* Because the arbitration agreement is separate and distinct from

18   the installment contract, it violates NRS 97.165. As a result, an agreement to arbitrate disputes

19   arising from or relating to the Gibbs-Bolender–Chapman installment contract was never formed

20   under Nevada law because that agreement was not part of the installment contract. An agreement

21   to arbitrate on an individual basis or to arbitrate "interpretation and scope" or "the arbitrability of

22

23   ──────────────

24   [9] NEV. REV. STAT. § 482.020(1).

[10] *See Kenworthy*, 17 Wash.App. at 654, 564 P.2d at 838; *accord* NEV. REV. STAT. § 97.165(1).

any issue" likewise was never formed under Nevada law because that agreement was not part of the installment contract.

### 3. *The rule is intended to protect consumers from this very situation.*

"The purpose of the single document requirement is to protect buyers from the deception and ambiguities which can arise when multiple documents are used."[11] The statute is intended to protect consumers by preventing automobile dealers from doing what Chapman, and therefore CAG as its assignee, did here: parade numerous documents in front of a buyer in a sales transaction, ask for the buyer's multiple signatures in a relatively short amount of time, and contractually bind the buyer to obligations she did not fully appreciate or understand. To help alleviate buyer confusion, the single-document rule requires dealers—and by operation of law the assignees of retail installment contracts who stand in a dealer's shoes—to include all of the terms of the parties' agreement within the four corners of the installment contract. Because the arbitration agreement CAG seeks to enforce is a separate document and no portion of that agreement is contained in the installment contract, the arbitration agreement itself and all its subparts must be treated as nonexistent under Nevada law.

### 4. *Courts interpreting similar rules do not recognize extraneous agreements.*

While there is no Nevada case law on point,[12] Michigan, Washington, and Pennsylvania have each interpreted and applied the single-document rule to preclude all extraneous documents that do not comply with their state's respective retail installment acts. In *Rugumbwa v. Betten*

---

[11] 17 Wash.App. at 655, 564 P.2d at 838. The one document rule also furthers the Nevada Legislature's laudatory policy of protecting consumers in what can be a confusing and difficult retail transaction involving tens of thousands of dollars and typically includes high-pressure sales tactics.

[12] The issue was first raised in *Clifton v. Eighth Jud. Dist. Ct.*, 124 Nev. 1458, 238 P.3d 802 (2008) (unpublished), and later in *Picardi v. Eighth Jud. Dist. Ct.*, 127 Nev. Adv. Op. 9, 251 P.3d 723 (2011), but not addressed by the Nevada Supreme Court in either case. *Clifton*, 124 Nev. at *2 ("transaction does not constitute a retail installment transaction"); *Picardi*, 251 P.3d at 724 n. 1 (not reaching the merits of single-document rule).

*Motor Sales*, a case directly right on point, the United States District Court for the Western District of Michigan held that an "arbitration clause contained in the sales order" and not in the installment contract "does not apply to the sale of the" vehicle because it violated Michigan's single-document rule.[13] The Michigan court determined that the clear language of Michigan's Retail Installment Sales Act requires "the execution of a single, comprehensive installment contract containing all of the agreements made by the parties with regard to the subject matter of the retail installment sale."[14] The arbitration clauses at issue in *Rugumbwa* were contained in sales orders that "were not even appended to the installment contract, but were entirely separate documents from the single installment sales contract mandated by" Michigan law.[15] The United States District Court for the Eastern District of Michigan reached the same conclusion in *Larkin v. New Century Auto Sales, Inc.*, and because the court found "that the Arbitration Agreement was not validly formed under Michigan Law," it determined that it "need not address any of the threshold questions regarding whether to compel arbitration."[16]

      The Court of Appeals of Washington's *Kenworthy v. Bolin* is another analogous case interpreting Washington's single-document rule.[17] The *Kenworthy* court held that an extraneous security agreement and conditional sales contract "violates the intention and spirit" of Washington's Retail Installment Sales Act because they were separate from the underlying retail

---

[13] 136 F.Supp.2d 729 (W.D. Mich. 2001); *accord Lozada v. Dale Baker Oldsmobile, Inc.*, 197 F.R.D. 321 (W.D. Mich. 2000) (holding that "as a matter of Michigan Law[,] ... [an] addendum was not an enforceable supplement to the RISC."); *Knight v. Springfield Hyundai*, 81 A.3d 940, 2013 PA Super 309 (2013) ("Looking at the clear and unambiguous language of the statute, it is apparent that when a buyer makes a purchase of a vehicle by installment sale, the RISC subsumes all other agreements relating to the sale." (citing 1 PA.C.S.A. § 1921(b))).

[14] 136 F.Supp.2d at 734.

[15] *Id.* at 733–34.

[16] No. 12-13917, 2014 WL 29119 at *6–7 (E.D. Mich. Jan. 3, 2014).

[17] 17 Wash.App. 650, 564 P.2d 835 (1977).

installment sales contract.[18] The court explained that the "plain, concise and unambiguous" language of Washington's Retail Installment Sales Act "makes it mandatory that all the elements of the [sales] agreement be set out in one document."[19] Even though the installment contract made numerous references to the extraneous agreements, the court invalidated the extraneous documents because the "purpose of the single-document requirement is to protect buyers from the deception and ambiguities which arise when more than one document is utilized to express the contract . . ."[20]

CAG might attempt to liken this case to *Pack v. Damon Corp.* and its progeny, but the comparison would be false.[21] The *Pack* court distinguished the facts in its case from the facts in *Rugumbwa* and *Lozada v. Dale Baker Oldsmobile, Inc.* because, unlike in those cases, the plaintiff in *Pack* was "not challenging the terms of his retail installment contract," but instead "warranties and performance under the terms of the September 6, 2002 sales agreement."[22] Because the sales agreement that the *Pack* plaintiff sued to enforce contained the warranties and an arbitration clause, the *Pack* court found it to be "in compliance with the 'one document rule.'"[23] Cases that apply *Pack* have done so for precisely the same reason.[24] But the facts in this

---

[18] *Id.* at 654–55, 564 P.2d 838. The Washington statute at issue in *Kenworthy* (RCW 63.14.020) is almost identical in its language and requirements to NRS 97.165(1) in so far as the entire agreement of the parties must be contained in a single document.

[19] *Id.* at 654, 564 P.2d 838.

[20] *Id.* at 655, 564 P.2d 383.

[21] 320 F.Supp.2d 545 (E.D. Mich. 2004), *rev'd in part on other grounds*, 434 F.3d 810 (6th Cir. 2006).

[22] *Id.* at 554.

[23] *Id.* at 555.

[24] *See e.g. Davis v. LaFontaine Motors, Inc.*, 271 Mich.App. 68, 79, 719 N.W.2d 890, 897 (2006) ("the dispute in this case does not relate directly to any provision of the retail installment motor vehicle purchase agreement"); *Harnden v. Ford Motor Co.*, 408 F.Supp.2d 300, 306 (E.D. Mich. 2004) (same).

1  action are not like those in *Pack*: Gibbs-Bolender's claims arise out of and directly relate to her

2  installment contract. *See e.g.* Doc. 1-3 ¶¶ 1, 42–43, 52, 54, 57, 68–77, 79, 85, 97, 104–09, 112,

3  128, 133. The introductory paragraph of the Complaint states that "This is a class action

4  complaint to redress the statutory and common law violations committed by [CAG] ... through

5  installation and operation of the 'Passtime Elite GPS' device on the Class' vehicles, and

6  **disregarding the Class' Retail Installment Sales Contracts ("RISC")**." Doc. 1-3 ¶ 1

7  (emphasis added). CAG correctly acknowledges this point in its motion. *See* Doc. 6 at 12:19–20

8  ("These claims directly arise out of Gibbs-Bolender's September 6th RISC and they relate to the

9  purchase of her vehicle."). *Pack* and its line of cases are thus materially distinguishable and do

10  not apply on these facts. The Court should instead apply the rationale of the *Rugumbwa* line of

11  cases and determine that this stand-alone arbitration agreement, and all its subparts, was never

12  formed under Nevada law because it is separate and distinct from the Gibbs-Bolender–Chapman

13  installment contract.

14  **B.    Nevada's single-document rule and the FAA are not in discord.**

15         Relying in part on the U.S. Supreme Court's decision in *AT&T Mobility LLC v.*

16  *Concepcion*, CAG argues that the Federal Arbitration Act ("FAA") preempts the Nevada Retail

17  Installment Sales Act and other similar state acts.[25] The question in *Concepcion* was whether the

18  FAA "preempts California's rule classifying most collective-arbitration waivers in consumer

19  contracts as unconscionable."[26] California's blanket rule was known as the *Discover Bank* rule,

20  and it mechanically invalidated a class action ban in an arbitration clause in certain consumer

21  contracts of adhesion.[27] In finding California's *Discovery Bank* rule at odds with the FAA, the

---

23  [25] 131 S.Ct. 1740 (2011).

24  [26] *Id.* at 1746.

[27] *Id.*

14

Supreme Court explained § 2 of the FAA, the savings clause, "permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or derive their meaning from the fact that an agreement to arbitrate is at issue."[28] *Marmet Health Care Center, Inc. v. Brown*, ___ U.S. ___, 132 S.Ct. 1201 (2012), also relied on by CAG, does nothing to expand this rule; it simply applies the *Concepcion* rule to preempt West Virginia's blanket policy refusing to enforce arbitration agreements in personal-injury or wrongful-death actions against nursing homes.

But Nevada's single-document rule does not apply only to arbitration or derive its meaning from the fact that an agreement to arbitrate is at issue. The plain language of NRS 97.165 is clear that it applies to all agreements made in the context of an installment sale generally; the statute is not specifically directed at agreements to arbitrate.[29] The United States District Court for the Eastern District of Michigan in *Larkin* has already considered whether Michigan's single-document rule runs afoul of the FAA in the wake of *Concepcion* and found it did not because, like Nevada, Michigan's statute "applies to all contracts generally" and contains no language "that is directed at agreements to arbitrate specifically."[30] The Michigan court concluded that where, like here, "a plaintiff seeks to challenge the subject matter of the retail installment sales contract, ... [Michigan's statute] operates to invalidate the stand alone Arbitration Agreement. Therefore it follows that where there is no valid arbitration agreement, there can be no federal preference to compel its enforcement."[31]

---

[28] *Id.* (citing *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652 (1996)).

[29] *See* NEV. REV. STAT. § 97.165(1).

[30] 2014 WL 29119 at *7–8.

[31] *See id.* at *8.

CAG's reliance on *Ferguson v. Corinthian Colleges, Inc.* is equally misplaced.[32] The Ninth Circuit noted in *Ferguson* that a federal court is "prohibited from applying any state statute that invalidates an arbitration agreement." However, this was in regard to California's "*Broughton–Cruz*" rule that interpreted California's Consumer Legal Remedies Act, a state statute allowing consumers the ability to seek public injunctions. The "*Broughton–Cruz*" rule is a judge-made rule intended for the specific class of consumers who bring private attorney general claims seeking injunctions. The rule essentially stated that there was an "inherent conflict" with the California Consumer Legal Remedies Act and arbitration agreements; therefore, arbitration could not be compelled for claims seeking a public injunction. The Ninth Circuit's decision in *Ferguson*, like *Marmet*, simply applies *Concepcion* to invalidate a state rule that "prohibits outright arbitration of a particular type of claim."[33] The *Ferguson* decision is not applicable here because NRS 97.165 does not prohibit outright arbitration of a particular type of claim. It merely provides that any agreement—arbitration or otherwise—not contained within the installment contract is not validly formed.

**C.    Both the FAA and Nevada's Uniform Arbitration Act reserve generally applicable contract defenses like Nevada's single-document rule.**

Notwithstanding the general presumption that arbitration agreements are valid and enforceable,[34] the FAA states that:

> [A]n agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, *save upon such*

---

[32] *Ferguson v. Corinthian Colleges, Inc.*, 733 F.3d 928 (9th Cir. 2013).

[33] *Id.* at 934.

[34] *See Clark County v. Blanchard Const. Co.*, 98 Nev. 488, 653 P.2d 1217 (1982) (recognizing Nevada's "policy strongly favoring arbitration where parties have previously agreed to that method of dispute resolution").

> *grounds as exist at law or in equity for the revocation of any contract.*[35]

Nevada's adoption of the Uniform Arbitration Act also closely follows this language.[36] Under these statutes, arbitration agreements are enforceable only insofar as they are not invalid as a matter of law. "This savings clause 'preserves generally applicable contract defenses.'"[37]

Nevada's single-document rule implicates the formation of an agreement not included in the installment contract. The rule is a generally applicable contract defense because it applies to all agreements made in the context of installment sales, not just arbitration agreements. The defense, therefore, is reserved under the FAA.

**D.     Statutes like NRS 97.165 should be liberally construed.**

Statutes with a protective purpose should be liberally construed in order to effectuate the benefits intended to be conferred.[38] Moreover, Nevada's Retail Installment Sales Act contains an express anti-waiver provision:

> *No act or agreement* of the retail buyer before or at the time of the making of a retail installment sales contract, retail charge agreement or purchases hereunder *shall constitute a valid waiver of any of the provisions of this chapter or of any remedies granted to the buyer by law.*[39]

The Nevada Supreme Court's interpretation of statutes regulating insurance contracts, which are also grounded in consumer protection, are instructive. The Nevada Supreme Court has held that contractual terms and agreements that are in contravention of the insurance contract regulations

---

[35] 9 U.S.C. § 2 (emphasis added).

[36] Nev. Rev. Stat. § 38.219(1).

[37] *Kilgore v. KeyBank, Nat. Assn.*, 718 F.3d 1052, 1058 (9th Cir. 2013) (quoting *Concepcion*, 131 S.Ct. at 1748).

[38] *See Edgington v. Edgington*, 119 Nev. 577, 80 P.23d 1282 (2003); *Welfare Division v. Washoe Co. Welfare Dept.*, 88 Nev. 635, 503 P.2d 457 (1972).

[39] Nev. Rev. Stat. § 97.275(2) (emphasis added).

17

contained in Title 57 of Nevada's statutes are against public policy and therefore unenforceable and invalid.

The Nevada Supreme Court's decision in *State Farm Mutual Automobile Ins. Co. v. Hinkle*[40] is a perfect example of a contract that was void because it did not comply with the statute and violated public policy. In *Hinkle*, an insured was injured by an uninsured third-party driver, but the injury was not sustained in the automobile listed on the insured's policy.[41] The insurer denied UM coverage based on an exclusion in the policy stating that UM coverage applied only if injury occurred while in operation of the "insured automobile."[42]  The insured never declined UM coverage as mandated by statute, nor did the insurer obtain a written waiver of said coverage, which was also mandated under the statute.[43] Because the insured did not reject coverage as required by the statute, the court found that "he, and the 'residents of his house, his spouse and the relatives of either, were entitled to uninsured motorist protection without limitation."[44]  The Nevada Supreme Court explained: **"The effort by the appellant to restrict that protection by an exclusionary provision violates the expressed public policy."**[45] And concluded: **"If a contract of insurance is at variance with the statutory requirement, it is against public policy and void."**[46]

Like the Nevada Supreme Court's application of Title 57 to insurance disputes regarding extraneous limitations on policies, this Court should find the extraneous arbitration agreement,

---

[40] 87 Nev. 478, 488 P.2d 1151 (1971).

[41] *Id.* at 480–81, 488 P.2d 1152.

[42] *Id.* at 481, 488 P.2d 1152.

[43] *Id.* at 481, 488 P.2d 1153.

[44] *Id.*

[45] *Id.* (emphasis added.)

[46] *Id.* at 484, 488 P.2d 1154 (emphasis added).

which is outside the four corners of the installment contract, was never validly formed under Nevada law. The public policy and consumer protection considerations that underlie all the requirements and prohibitions of Nevada's Retail Installment Sales Act constitute "grounds as exist at law or in equity for the revocation of any contract."

**E.     The opt-out provision does not make this unconscionable arbitration agreement enforceable.**

In Nevada, "'both procedural and substantive unconscionability must be present in order for a court to exercise its discretion to refuse to enforce a ... clause as unconscionable.'"[47] Procedural unconscionability focuses on whether the party has been given a meaningful opportunity to agree to its terms while substantive unconscionability focuses on the one-sidedness of the contract terms."[48] "[L]ess evidence of substantive unconscionability is required in cases involving great procedural unconscionability."[49]

The arbitration agreement CAG seeks to enforce is substantively unconscionable because it is one-sided. It exempts from arbitration all of the remedies the dealer and its assignee would want to employ—"self-help" remedies—but requires arbitration of the remedies buyers would want to use. *See* Doc. 6-8 at 2. Although the clause allows both parties to seek self-help remedies, it is of no real benefit to buyers who have no self-help remedies against the dealer or its assignee. The agreement thus seeks to insulate claims against the dealer and its assignee from arbitration while ensuring the remedies they want to employ are not arbitrated nor do they constitute a waiver of arbitration.

---

[47] *D.R. Horton, Inc. v. Green*, 120 Nev. 549, 553, 96 P.3d 1159, 1162 (2004).

[48] *Id.* at 554, 96 P.3d 1162–63.

[49] *Id.* at 553–54, 96 P.3d 1162.

The agreement is also, and even more so, procedurally unconscionable. "An adhesion contract has been defined as a standardized contract form offered to consumers of goods and services essentially on a 'take it or leave it' basis, without affording the consumer a *realistic* opportunity to bargain, and under such conditions that the consumer cannot obtain the desired product or service except by acquiescing to the form of the contract."[50] "The distinctive feature of an adhesion contract is that the weaker party has no choice as to its terms."[51] There can be no doubt here that Chapman's pre-printed, form loan contract is a contract of adhesion. It was presented on a take-it-or-leave-it basis with no discussion that any of its terms were negotiable.[52] This alone establishes procedural unconscionability in Nevada.[53]

Companies have cleverly started to add new contract terms, including opt-out provisions, as Chapman has done here. These "opt-out" clauses purport to give consumers the right to reject forced, binding, pre-dispute arbitration. The implication the companies would like courts to draw is that because the clause exists, the consumers have been provided an opportunity to bargain, thus making the pre-printed form contract not procedurally unconscionable. But that theory does not hold up because there is no *realistic* or *meaningful* opportunity to bargain.[54] "Burying an opt-out clause in a fine-print contract does not mean that every consumer or employee who fails to

---

[50] *Obstetrics and Gynecologists v. Pepper*, 101 Nev. 105, 107, 693 P.2d 1259, 1260 (1985) (emphasis added) (arbitration agreement form handed to patient at medical clinic by receptionist as a condition of receiving treatment was a contract of adhesion).

[51] *Id.*

[52] Exhibit 3 ¶¶ 5–10, 33.

[53] *D.R. Horton, Inc.*, 120 Nev. at 554, 96 P.3d at 1162 ("clause is procedurally unconscionable when a party lacks a *meaningful* opportunity to agree to the clause terms... because of unequal bargaining power, as in an adhesion contract....") (emphasis added)).

[54] F. Paul Bland, Jr. & Claire Prestel, *Challenging Class Action Bans in Mandatory Arbitration Clauses*, 10 Cardozo J. Conflict Resol. 369, 387–389 (2009).

20

opt out has chosen arbitration voluntarily."[55] Companies utilize this language as a strategy,

knowing that most consumers, and few if any potential class members, fully read contracts.

Simply adding this language does not indicate that the consumer understands arbitration or how

it differs from litigation:

> Commentators have explained why this is so: optimism bias means
> that potential plaintiffs will underestimate the risk of a future
> dispute and undervalue their right to proceed in court; status quo
> bias encourages the default option and makes opt outs unlikely;
> many consumers and employees will not read a standard-form
> agreement, let alone understand it; contracts are often confusingly
> written… consumers and employees often face a paralyzing
> information overload…. and consumers and employees have less
> information than corporate defendants about the arbitration
> process, and this lack of information makes a meaningful choice
> more difficult.[56]

There are numerous examples where opt-out rights are rarely utilized. These include music

subscription clubs, "Free Credit Report" clubs, and athletic clubs. Companies rely on the "status

quo" or "inertia bias" where subscribers fail to cancel automatically renewed subscriptions.[57]

Arbitration opt-out clauses carry the same result, meaning there was no true voluntary choice.

CAG argues that the consumer has a meaningful time to opt out because extraneous

arbitration agreements contracts allow 10 days to opt out. But that provision is not *meaningful*

and does not substitute for a *realistic* opportunity to bargain. Consumers like Gibbs-Bolender are

individuals without credit options who are forced to sign whatever paperwork is set before them

in order to acquire funds for a vehicle they are under pressure to obtain at that moment. This is

especially true in Gibbs-Bolender's case, having been required to come back to the dealership

two additional times to sign a new installment contract.

---

[55] *Id*. at 387.

[56] *Id.* at 387–388 (collecting authorities).

[57] *Id.*

1    A meaningful time to be allowed to opt out would be after a dispute has developed. It is

2  highly probable that few, if any, Chapman's consumers have opted out of arbitration.  This

3  clause, regardless, does not change the contract from a take-it-or-leave-it contract of adhesion to

4  an equally negotiated contract. Between the unsophisticated consumer and the business savvy car

5  dealer, there is a great disparity and, in reality, no bargaining power on the part of the consumer.

6    California courts have held several arbitration agreements procedurally unconscionable

7  despite the presence of an opt-out clause.[58] In *Hoffman*, the Ninth Circuit looked at contract

8  provisions that included the option for the consumer to file in small claims court with Citibank

9  picking up the tab in certain circumstances, and an "opt-out" clause that required the consumer to

10  notify Citibank, in writing, within 26 days if she wished to not accept the binding arbitration

11  provision. The Ninth Circuit confirmed that "two district courts in our circuit have determined

12  that the ability to rescind a contract within 21 or 30 days does not necessarily insulate class

13  arbitration waivers within such contracts from procedural unconscionability. Additionally, this

14  circuit has 'consistently followed the courts that reject the notion that the existence of

15  'marketplace alternatives' bars a finding of procedural unconscionability.'"[59]

16    CAG might argue that *Concepcion* effectively preempts any unconscionability arguments

17  toward both arbitration clauses and class action waivers; however, the Ninth Circuit has

18  distinguished certain instances where arbitration agreements and class action waivers would be

19  considered unconscionable.[60] In *Smith v. Jem Group, Inc.*, a group of debt-settlement companies

20  and their respective law firm required consumers to sign an arbitration agreement and a class-

21

22  [58] *Gentry v. Super. Ct.*, 42 Cal.4th 443, 457, 165 P.3d 556 (2007); *Hoffman v. Citibank, N.A.*, 546
F.3d 1078 (9th Cir. 2008).

23  [59] 546 F.3d at 1085.

24  [60] See *Newton v. Am. Debt Servs., Inc.*, 549 F. Appx 692 (9th Cir. 2013); *Smith v. Jem Group,
Inc.*, 737 F.3d 636 (9th Cir. 2013).

action waiver hidden within the law firm's retainer agreement. Consumers filed a class-action complaint against all of the debt-settlement companies and the related law firm. The companies moved to compel arbitration. The district court denied the motion and deemed the arbitration clause unconscionable under Washington law, and the companies appealed citing *Concepcion*. The Ninth Circuit held that the *Concepcion* decision did not preempt Washington's procedural unconscionability law for three reasons. First, Washington law did not unduly burden arbitration.[61] Second, rather than specific doctrines focusing on arbitration, "Washington procedural unconscionability law is concerned only with the process that results in the formation of the agreement."[62] Third, "Washington procedural unconscionability law applicable to [attorney retainer agreements] is not specifically aimed at arbitration clauses."[63]

Nevada's law meets all three factors stated in *Jem Group, Inc*. In Nevada, a clause is procedurally unconscionable when "a party lacks a meaningful opportunity to agree to the clause terms either because of unequal bargaining power, as in an adhesion contract…."[64] This definition of procedural unconscionability does not unduly burden arbitration nor does it specifically focus on arbitration clauses in any way; it merely singles out adhesion contracts like the one presented to Gibbs-Bolender on September 6. Although CAG cites *Picardi v. Eighth Jud. Dist. Ct.* as being preempted by *Concepcion*, *Picardi* does not apply here because that case was decided on public policy grounds and did not address the unconscionability of the contract.[65] Chapman's arbitration agreement is substantively and procedurally unconscionable and the opt-out provision does not change that fact.

---

[61] *Smith*, 737 F.3d at 641.

[62] *Id.* at 642.

[63] *Id.*

[64] *D.R. Horton, Inc.*, 120 Nev. at 554, 96 P.3d at 1162.

[65] 127 Nev. Adv. Op. 9, 251 P.3d 723 (2011).

**F.      Courts, not arbitrators, decide in the first instance whether an agreement to arbitrate has been formed.**

CAG argues that under *Momot v. Mastro*, 652 F.3d 982 (9th Cir. 2011) and *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63 (2010), the only challenge this Court can hear is that the delegation clause in the arbitration agreement is unconscionable. Doc. 6 at 10–11. But CAG, like the teamsters and Ninth Circuit in *Granite Rock Co. v. Intern. Broth. of Teamsters*, "overreads [these] precedents."[66] "'The language and holdings' that CAG relies on 'cannot be divorced from the first principle that underscores all of [the Supreme Court's] arbitration decisions: Arbitration is strictly 'a matter of consent,' ... and thus 'is a way to resolve those disputes–*but only those disputes*–that the parties have agreed to submit to arbitration. . . .'"[67] Under this fundamental principle, the Supreme Court's "precedents hold that courts should order arbitration of a dispute only where the court is satisfied that neither the formation of the parties' arbitration agreement *nor* (absent a valid provision specifically committing such disputes to an arbitrator) its enforceability or applicability to the dispute in issue. Where a party contests either or both matters, 'the court' must resolve the disagreement."[68] Gibbs-Bolender contests the former: that neither an agreement to arbitrate disputes nor an agreement to have an arbitrator determine "the arbitrability of any issue" was formed under Nevada law. The FAA and Supreme Court precedent interpreting that act are clear that a "'court' must resolve [this] disagreement."[69]

---

[66] 561 U.S. 287, 299, 130 S.Ct. 2847, 2857 (2010) (collecting cases and quoting *Volt Info. Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479, 109 S.Ct. 1248 (1989); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920 (1995)).

[67] *Id.*

[68] *Id.* at 299, 130 S.Ct. 2857–58.

[69] *See id.*

24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

## IV. Conclusion

No agreement to arbitrate, to arbitrate on an individual basis, or to delegate issues to an arbitrator was formed under Nevada law. Even if an agreement to arbitrate was formed, it is so substantively and procedurally unconscionable that it cannot be enforced under Nevada law. Accordingly, Gibbs-Bolender requests that the Court deny the Defendant's Motion to Dismiss to Compel Arbitration and permit Gibbs-Bolender to proceed on her claims in her own name and on behalf of the class.

DATED this  7th  day of November, 2014.

 _/s/ Carol L. Harris_
J. RANDALL JONES, ESQ.
Nevada Bar No.: 1927
CAROL L. HARRIS, ESQ.
Nevada Bar No.: 10069
**KEMP, JONES & COULTHARD, LLP**
3800 Howard Hughes Pkwy, 17th Floor
Las Vegas, Nevada 89169
Telephone: (702) 385-6000
Facsimile: (702) 385-6001
c.harris@kempjones.com

DAN L. WULZ, ESQ.
Nevada Bar No.: 5557
SOPHIA A. MEDINA, ESQ.
Nevada Bar No.: 12446
**LEGAL AID CENTER OF
SOUTHERN NEVADA, INC.**
725 E. Charleston Blvd.
Las Vegas, NV  89104
Telephone: (702) 386-1070 x 1453
Facsimile: (702) 386-1453
smedina@lacsn.org

_Attorneys for Plaintiff_

**<u>Certificate of Service</u>**

I hereby certify that on the 7th day of November, 2014, a true and correct copy of the foregoing Plaintiff's Response to Defendant's Motion to Dismiss to Compel Arbitration or, Alternatively, to Stay Proceedings Pending Arbitration was served on the following persons as indicated below:

A.    Service was made via the Court's ECF System to the following:

Dan L Wulz dwulz@lacsn.org, rnajera@lacsn.org

J. Randall Jones jrj@kempjones.com

Kevin R Stolworthy kstolworthy@armstrongteasdale.com, cflynn@armstrongteasdale.com, sdarling@armstrongteasdale.com

Tracy DiFillippo tdifillippo@armstrongteasdale.com, cflynn@armstrongteasdale.com, enunez@jonesvargas.com, jelia@armstrongteasdale.com

Carol L Harris c.harris@kempjones.com, ade@kempjones.com, srd@kempjones.com

Conor P. Flynn cflynn@armstrongteasdale.com, sdarling@armstrongteasdale.com
Brandon P. Johansson bjohansson@armstrongteasdale.com, rfortin@armstrongteasdale.com

Sophia A Medina smedina@lacsn.org, rnajera@lacsn.org

B.    Service via U.S. Mail, first-class, postage prepaid to the following:

Edwin D. Fleming
Jake D. Curtis
Burch & Cracchiolo PA
702 E. Osborn Rd., Ste. 200
Phoenix, AZ 85014


                                      _/s/ Angela Embrey_____
                                      An employee of Kemp, Jones & Coulthard, LLP