# EXHIBIT 1

Print Form



Compliance Enforcement Division
555 Wright Way
Carson City, NV 89711-0900
(775) 684-4790
www.dmvnv.com

## DISCLOSURE FORM

**NOTICE TO PURCHASER:** NevadaStateLaw requires the use of a disclosure form whenever a seller of a vehicle exercises a valid option to cancel the sale of a vehicle. The seller must provide a disclosure form, and the customer must sign the disclosure form, before the seller and customer may enter into a new agreement for the sale of the same vehicle on different terms, or for the sale of a different vehicle.

**YOU ARE NOT OBLIGATED TO PROCEED WITH PURCHASING THE SAME VEHICLE UNDER DIFFERENT TERMS OR TO PURCHASE A DIFFERENT VEHICLE. YOU MAY RETURN THE VEHICLE, PROVIDING NO DAMAGE TO THE VEHICLE HAS OCCURRED SINCE RECEIPT OF THE VEHICLE, OTHER THAN REASONABLE WEAR AND TEAR. THE SELLER MUST RETURN ANY DOWN PAYMENT OR OTHER CONSIDERATION IN FULL, INCLUDING, RETURNING A VEHICLE ACCEPTED IN TRADE.**

### SECTION 1: TO BE COMPLETED BY SELLER

Business Name _____   Business License Number _____

Business Mailing Address: _____
                           Street                City           State        Zip

**SAME VEHICLE SALE INFORMATION**
To be completed when the same vehicle is being sold under new sale terms.

Vehicle Year: _____   Vehicle Make: _____   Vehicle Model: _____

Vehicle Identification Number: _____

| **INITIAL TERMS** | | **REVISED TERMS** | |
|---|---|---|---|
| **Number of Payments** | _____ | **Number of Payments** | _____ |
| **Monthly Payment:** (including sales tax) | _____ | **Monthly Payment:** (including sales tax) | _____ |
| **Annual Percentage Rate** | _____ | **Annual Percentage Rate** | _____ |
| **Total Finance Charge** | _____ | **Total Finance Charge** | _____ |
| **Total Sales Price** | _____ | **Total Sales Price** | _____ |

**SECOND VEHICLE SALE INFORMATION**
To be completed for a second vehicle when the initial vehicle is returned.

Vehicle Year: _____   Vehicle Make: _____   Vehicle Model: _____

Vehicle Identification Number: _____   Annual Percentage Rate: _____

Number of Payments: _____   Total Finance Charge: _____

Monthly Payment: _____   Total Sales Price: _____
(Including Sales Tax)

### SECTION 2: TO BE COMPLETED BY BUYER

Buyer's Name: _____

Buyer's Mailing Address: _____
                          Street                City           State        Zip
Buyer's Physical Address: _____
                           Street                City           State        Zip
Telephone Number: (_____) _____ - _____

E-Mail Address: _____

### AGREEMENT TO ACCEPTANCE OF SELLER'S TERMS FOUND IN SECTION 1

I, _____ accept the terms found in Section 1 of this disclosure form and understand:

**Initial**

a. That Nevada State Law does not require me to accept the vehicle initially delivered
   to me under different terms as initially agreed to, or to accept a different vehicle.          _____

b. That I may return the vehicle delivered to me and receive my down payment or other
   consideration, including my trade in vehicle, providing the vehicle delivered to me has
   not been damaged other than normal wear and tear.                                              _____

Signature of Buyer: _____   Date: _____

OBL315 (10/2011)

# EXHIBIT 2

*The Consumer Credit and Sales Legal Practice Series*

**DECEPTION AND WARRANTIES LIBRARY**

# AUTOMOBILE FRAUD

Odometer, Salvage, and Lemon Laundering Fraud, Title Abuses and Yo-Yo Sales

Fourth Edition



See *page ix* for information about the companion website.

Carolyn L. Carter
John W. Van Alst
Jonathan Sheldon

**National Consumer Law Center®**
7 Winthrop Square, 4th Floor    Boston, MA 02110          www.consumerlaw.org

| | |
|---|---|
| *About NCLC®* | The National Consumer Law Center®, a nonprofit corporation founded in 1969, assists consumers, advocates, and public policy makers nationwide who use the powerful and complex tools of consumer law to ensure justice and fair treatment for all, particularly those whose poverty renders them powerless to demand accountability from the economic marketplace. For more information, go to www.nclc.org. |
| *Ordering NCLC Publications* | Order securely online at www.nclc.org, or contact Publications Department, National Consumer Law Center, 7 Winthrop Square, 4th Floor, Boston, MA 02110, (617) 542-9595, FAX: (617) 542-8028, e-mail: publications@nclc.org. |
| *Training and Conferences* | NCLC participates in numerous national, regional, and local consumer law trainings. Its annual fall conference is a forum for consumer rights attorneys from legal services programs, private practice, government, and nonprofit organizations to share insights into common problems and explore novel and tested approaches that promote consumer justice in the marketplace. Contact NCLC for more information or see our website. |
| *Case Consulting* | Case analysis, consulting and co-counseling for lawyers representing vulnerable consumers are among NCLC's important activities. Administration on Aging funds allow us to provide free consulting to legal services advocates representing elderly consumers on many types of cases. Massachusetts Legal Assistance Corporation funds permit case assistance to advocates representing low-income Massachusetts consumers. Other funding may allow NCLC to provide very brief consultations to other advocates without charge. More comprehensive case analysis and research is available for a reasonable fee. See our website for more information at www.nclc.org. |
| *Charitable Donations and* Cy Pres *Awards* | NCLC's work depends in part on the support of private donors. Tax-deductible donations should be made payable to National Consumer Law Center, Inc. For more information, contact Gerald Tuckman of NCLC's Development Office at (617) 542-8010 or gtuckman@nclc.org. NCLC has also received generous court-approved *cy pres* awards arising from consumer class actions to advance the interests of class members. For more information, contact Robert Hobbs (rhobbs@nclc.org) or Rich Dubois (rdubois@nclc.org) at (617) 542-8010. |
| *Comments and Corrections* | Write to the above address to the attention of the Editorial Department or e-mail consumerlaw@nclc.org. |
| *About This Volume* | This is the Fourth Edition of *Automobile Fraud*. Discard all prior editions and supplements. This book includes a companion website. Continuing developments can be found in periodic supplements to and revised editions of this volume, on the companion website, and in NCLC REPORTS. |
| *Cite This Volume As* | National Consumer Law Center, Automobile Fraud (4th ed. 2011). |
| *Attention* | *This publication is designed to provide authoritative information concerning the subject matter covered. Always use the most current edition and supplement, and use other sources for more recent developments or for special rules for individual jurisdictions. This publication cannot substitute for the independent judgment and skills of an attorney or other professional. Non-attorneys are cautioned against using these materials to conduct a lawsuit without advice from an attorney and are cautioned against engaging in the unauthorized practice of law.* |
| *Copyright* | © 2011 by National Consumer Law Center, Inc. National Consumer Law Center and NCLC are registered trademarks of National Consumer Law Center, Inc. All rights reserved.<br><br>ISBN: 978-1-60248-095-7 (this volume)<br>ISBN: 978-0-943116-10-5 (Series)<br><br>Library of Congress Control Number: 2011942829 |

# Chapter 4

# Yo-Yo (Spot-Delivery) Abuses and Sublease Scams

## 4.1 Getting Started

### 4.1.1 Introduction

This chapter focuses on fraud relating to the ownership of a motor vehicle, in two specific contexts. The first is the common situation, called a yo-yo or spot delivery transaction, in which a consumer is led to believe she owns the car, but the dealer tries to retain the right to back out of the deal for days or even weeks after the consumer drives home with the vehicle. If the dealer decides to unwind the deal, it demands the vehicle back or requires the consumer to pay more in financing costs or other charges.

The second situation is less common, but still a significant area of abuse. Consumers who feel they cannot afford their lease or car loan payments, or otherwise want to get out from under their car loan or lease, are victimized by brokers who promise much more than they deliver. They promise, for a fee, to find another consumer to take over the vehicle and its monthly payments, usually as a sublease. Too often, the consumer remains obligated on the original loan or lease, and payments are never forwarded to the lender. Consumer remedies for such sublease scams are examined in § 4.8, *infra*. The earlier part of the chapter focuses on yo-yo transactions.

### 4.1.2 Yo-Yo Transactions Explained

Yo-yo transactions, also referred to as spot-delivery, take-back, MacArthur ("I shall return"), or gimme-back transactions, are one of the most widespread automobile dealer abuses today, applying to new and used car sales and automotive leases. The yo-yo sale is standard operating procedure at many dealerships.

The consumer believes a vehicle's installment sale or lease is final and the dealer gives the consumer possession of the car "on the spot." The dealer later tells the consumer to return the car because financing has fallen through.[1] If the consumer does not return the vehicle or agree to rewrite the transaction on less favorable terms, the dealer repossesses the vehicle and, in some extreme cases, has the consumer arrested if the consumer does not return the car.

Yo-yo sales are one-sided. The dealer insists that the consumer is bound by the agreement, but the dealer feels free to back out of the deal. Although the true motivation for the dealer backing out can be one of any number of things, the stated justification usually is that the financing fell through.[2]

Even if this stated justification is in fact the real one, it is still misleading. It implies that the dealer is simply arranging financing with a third party lender, and it is the third party lender who is extending the credit, not the dealer. In fact, the dealer is the originating creditor extending the installment loan to the consumer in almost all dealer financing transactions. The dealer then seeks to sell that installment sales contract, at a profit, to a lender.

In the credit marketplace, the dealer can always find a buyer for the installment loan. The only question is whether the dealer will sell the loan at a loss, break even, or make a profit. Because dealers want to make a significant profit selling the paper, another way to rephrase the dealer's justification for canceling the sale is that the dealer could not sell the loan paper at a large enough profit, and therefore wants to back out of the deal.

One motivation for a dealer to send the consumer home with a car and a conditional agreement is that the dealer wants to lock in the consumer. The dealer does not want the consumer visiting other dealerships and thinking over the deal while the dealer determines if it can find financing that will give the dealer a profit to its liking. So it wants the consumer to think the deal is final, even if the dealer does not wish it to be final.

---

1  *See, e.g.*, Barnes v. Rosenthal Toyota, Inc., 727 A.2d 431 (Md. Ct. Spec. App. 1999).

2  *Cf.* Janikowski v. Lynch Ford Inc., 210 F.3d 765 (7th Cir. 2000) (consumer failed to show dealer acted with deceptive knowledge or intent when consumer came into dealership just before closing, dealer told consumer that consumer might not qualify for 5.9% financing on note with financing contingency, dealer let the consumer drive the car home that night without having the consumer bring in the trade-in, and the contract was rewritten the next day at 11.9% after lender downgraded consumer's credit rating to a "4" from the "2" estimated by the dealership).

In its most insidious form, a yo-yo sale is a premeditated sales tactic to squeeze more money out of the consumer by canceling the first contract in the hopes of reworking the terms. The dealer attempts to gain more leverage by pretending to agree to one loan package, but then bringing the consumer back to the dealership a second, third, or even fourth time, to keep renegotiating the deal. The consumer must either return the vehicle or agree to substantially higher monthly payments, a higher down payment, a longer term loan, or a different (worse) car.[3]

The dealer's leverage on the typical consumer in this situation is crushing: after showing off the car to family and friends, consumers must either rewrite the deal or admit to their family and friends that their credit record is so bad the car had to be returned. Moreover, dealers often pressure consumers into rewriting the deal by claiming that their trade-in has already been sold, or that the consumer will not get back any of the down payment if the deal dissolves.

Whether the yo-yo sale is part of a scheme from the beginning to bump up the financing costs, or the dealer just wants to lock in the consumer while it explores its profit from the financing, the yo-yo sale is a one-sided transaction. Once the consumer drives the car off the lot, the consumer is locked into the sale. The dealer does not want the consumer to think about the deal overnight—it wants the deal closed on the spot. The dealer has just put a full court press on the consumer, perhaps sending in sales personnel in relays. The last thing the dealer wants is for the consumer to go home and think things over, with the opportunity to back out of the deal.

On the other hand, the dealer wants to retain its options when the consumer drives off the lot with the car. It does not want to be rushed into a hasty deal. It wants time for its personnel to determine how much profit can really be made out of the deal selling the loan paper, and whether the lender will agree to the many add-on charges the dealer has packed into the deal. The dealer may also want time to reflect on whether it can squeeze more out of the consumer or, if not, whether it is better off selling the vehicle to someone else.

Usually the dealer will want to hide the one-sided nature of the transaction. It does not want consumers to think that they can get out of a deal just because the dealer can. So, while there may be some purported conditional sales form in the numerous papers signed by the consumer, the dealer will behave and often orally state that it is a done deal and not disclose that the deal, from the dealer's point of view, is not final.[4]

The practice not only harms the consumers who are involved but all car buyers. The fact that this practice is so common makes it almost impossible for consumers to compare credit terms to find the best loan rates. Many dealers have a large number of their clients sign spot delivery agreements and a surprisingly large number of consumers who do are called and told the dealer will not honor the initial terms offered.[5] When the rate that the consumer is quoted by the dealer may or may not be what the consumer will actually get, the consumer has no basis upon which to compare other offers of credit from other lenders. Accordingly, this practice undermines the very purpose of the Truth in Lending Act, by making it next to impossible for the consumer to comparison shop for credit.[6]

### 4.1.3 *Organization of This Chapter*

This chapter examines various approaches consumers can use to challenge yo-yo sales and sublease scams. To oversimplify, there are two major strategies in a yo-yo case. One is a fact-intensive demonstration that the dealer has engaged in unfair and deceptive acts and practices (UDAP), fraud, conversion, or other state law violations, and the consumer seeks actual, and perhaps multiple or punitive, damages. The other strategy focuses on the paperwork that dealers and lenders are required to provide in yo-yo transactions and looks for violations of the Truth in Lending Act (TILA), the Equal Credit Opportunity Act (ECOA), the Fair Credit Reporting Act (FCRA), or the federal odometer act, leading to claims for actual, statutory, or punitive damages, plus attorney fees. The first strategy will likely land the litigants in state court, while the second strategy or a combination of the two will meet federal court jurisdictional requirements.

Section 4.2, *infra*, examines whether a dealer's cancellation of an automotive sale or lease is legal and whether the transaction leading to that cancellation involves deception or fraud. Section 4.3, *infra*, summarizes common TILA, ECOA, and FCRA disclosure and notice violations in yo-yo transactions. Section 4.4, *infra*, details why dealers, even if

---

3 This practice is described in Rucker v. Sheehy Alexandria, Inc., 228 F. Supp. 2d 711 (E.D. Va. 2002), and Gibson v. LTD, 434 F.3d 275 (4th Cir. 2006). *See also* Byrd v. Frost, 2008 WL 5412088 (E.D. Pa. Dec. 29, 2008).

4 *But see* Janikowski v. Lynch Ford Inc., 210 F.3d 765 (7th Cir. 2000) (no UDAP violation when dealer, clearly warned consumer that deal was not final and dealer, on the facts of that case, was taking a greater risk than the consumer if deal fell through); Love v. O'Connor Chevrolet, Inc., 2006 WL 2460581 (N.D. Ill. Aug. 21, 2006) (no UDAP violation as consumer was warned that transaction was not final).

5 *See* Salvagne v. Fairfield Ford, Inc., 264 F.R.D. 321 (S.D. Ohio 2009) (court notes that of 375 consumers required by one dealer to sign a spot delivery form, 90 were subsequently contacted by the dealer and required to sign a new installment sales contract with different terms).

6 Salvagne v. Fairfield Ford, Inc., 2010 WL 3292967 (S.D. Ohio Aug. 19, 2010) (use of a separate spot delivery agreement imposing a condition subsequent on a fully integrated, binding installment sales contract purporting to contain the entire agreement between the parties violates TILA as consumers are unable to compare credit offers). *But see* Chastain v. N.S.S. Acquisition Corp., 2009 WL 1971621 (S.D. Fla. July 8, 2009) (installment sales contract which contains spot delivery agreement creating condition subsequent sale does not violate TILA).

they can cancel the transaction, almost always improperly structure the yo-yo transaction, leading to further legal violations.

Sections 4.5 and 4.6, *infra*, explore yo-yo violations occurring after the deal is canceled, involving return of the consumer's trade-in or deposit and the dealer's attempts to switch the consumer to a less favorable, second transaction. Section 4.7, *infra*, provides litigation practice pointers—whether an arbitration clause in a yo-yo transaction is binding on the consumer, types of discovery that should be sought in yo-yo litigation, and issues concerning settlement and remedies.

A final section, § 4.8, *infra*, considers an entirely different abuse involving brokers who allegedly help consumers sublease or sell their vehicles. This section is included in this chapter because it also involves misrepresentations as to the ownership and proper transfer of title in a vehicle.

## 4.1.4 State Yo-Yo Laws

At present about one-third of the states have some kind of official pronouncement about yo-yo sales, but there are significant variations from state to state. It is thus important to stay current with a particular jurisdiction's statutory law and any administrative rulings from the state's dealer licensing board, department of motor vehicles, attorney general's office, or other state agency. Alaska, Arizona, Colorado, Illinois, Louisiana, Nevada, New Hampshire, Utah, Virginia, and Washington have enacted yo-yo statutes,[7] and North Carolina has a statute with some relevance to yo-yo sales.[8] Idaho, Massachusetts, and Ohio deceptive practices (UDAP) regulations provide certain minimal protections.[9] Arizona, Maine, Maryland, and Michigan have issued important administrative interpretations to dealers on the subject.[10] In addition, many statutes regulate portions of the yo-yo transaction, and these will be described in this chapter. For example, a number of states restrict a dealer's ability to resell the consumer's trade-in before a deal is final.

## 4.2 Dealer's Right to Cancel the Yo-Yo Transaction

### 4.2.1 Absent Valid Contingency Clause, No Right to Cancel

To make a transaction contingent on the dealer obtaining financing, the parties must explicitly agree to such a condition. In the most egregious case, a dealer attempts a yo-yo sale with no written document or other basis for making the sale contingent on financing. Instead the dealer preys on the consumer's ignorance (and some courts' confusion) as to the dealer's role in the transaction and the relationship of the dealer and the bank or finance company. In the typical motor vehicle installment sales agreement, it is the dealer that originally extends credit. Its name is on the note as the creditor and it is bound to the credit contract by signing it or by offering it to the consumer.

The bank or finance company, who most consumers assume is the lender, is actually just an assignee of the dealer. If the finance company declines the assignment, there is still a binding credit agreement between the consumer and dealer. Even though the dealer may not think of itself as extending credit and even though the dealer may orally state that it does not provide financing, as a matter of law, by entering into such a credit agreement it has extended credit, even if it routinely assigns the contract to a finance company. The consumer's obligation to pay for the car, pursuant to the purchase agreement, has been met by the retail installment sales agreement that replaces the consumer's obligation to pay cash with the obligation to pay the dealer on a monthly basis. The consumer is not in default of that agreement simply because the dealer fails to assign the agreement to a third party.[11]

---

7 Alaska Stat. § 45.25.610; Ariz. Rev. Stat. Ann. § 44-1371; Colo. Rev. Stat. § 6-1-708; 815 Ill. Comp. Stat. § 505/2C; La. Rev. Stat. Ann. § 32:1261(2)(f); Nev. Rev. Stat. § 482.554; N.H. Rev. Stat. Ann. § 361-A:10-b; Utah Code Ann. §§ 41-3-401 (sales), 41-3-401.5 (leases) (West); Va. Code Ann. § 46.2-1530; Wash. Rev. Code § 46.70.180(4).

8 N.C. Gen. Stat. § 20-75.1.

9 Idaho Admin. Code r. 04.02.01.237; 940 Mass. Code Regs. § 5.04; Ohio Admin. Code 109:4-3-16(A)(30); *see* Braucher v. Mariemont Auto, 2002 WL 1393570 (Ohio Ct. App. June 28, 2002) (yo-yo seller violated regulation by not providing written contingency agreement).

10 The Arizona Attorney General's Automobile Advertising Guidelines (1993); Maine Office of Consumer Credit Regulation, *Maine Creditor Update*, Issue No. 38 at 8 (Oct./Nov. 1999) (available on this treatise's companion website); Maine Office of Consumer Credit Regulation, Examination of Cens Auto Group, Inc. (Oct. 29, 1999) (available on this treatise's companion website); Maryland Motor Vehicle Admin. Bull. No. D-03-05-01 (Mar. 10, 2005); Maryland Motor Vehicle Admin., "Spot Delivery"—"Fronting"—"MacArthur Statement" etc., Bull. No. D-11 98-01 (Nov. 30, 1998) (available on this trea-

tise's companion website); Letter from Murray Brown, Deputy Comm'r, Michigan Dep't of Commerce to [licensee] (May 22, 1989) (available on this treatise's companion website); Michigan Auto. Dealers Ass'n, Dealer Advisory, Spot Deliveries (Oct. 24, 1997) (available on this treatise's companion website).

11 *See* Streit v. Fireside Chrysler-Plymouth, Inc., 697 F.2d 193 (11th Cir. 1983) (contract does not become "unconsummated" just because assignment of retail installment contract is never executed); Muro v. Hermanos Auto Wholesalers, Inc., 514 F. Supp. 2d 1343 (S.D. Fla. 2007) (nothing in credit agreement indicating that deal is conditional); McFarland v. Bob Saks Toyota, Inc., 466 F. Supp. 2d 855 (E.D. Mich. 2006) (dealer could not show it was entitled to repossess vehicle when installment sales contract had no language that transaction was contingent upon financing and consumer had not defaulted); Walker Mobile Home Sales v. Walker, 965 S.W.2d 271 (Mo. Ct. App. 1998) (consumer not liable to dealer when consumer

# EXHIBIT 3

Case 2:14-cv-01684-APG-GWF   Document 19-1   Filed 11/08/14   Page 9 of 13

DAN L. WULZ, ESQ.
Nevada Bar No.: 5557
SOPHIA A. MEDINA, ESQ.
Nevada Bar No.: 12446
**LEGAL AID CENTER OF
SOUTHERN NEVADA, INC.**
725 E. Charleston Blvd.
Las Vegas, NV 89104
Telephone: (702) 386-1070 x 1453
Facsimile: (702) 386-1453
smedina@lacsn.org

J. RANDALL JONES, ESQ.
Nevada Bar No.: 1927
CAROL L. HARRIS, ESQ.
Nevada Bar No.: 10069
**KEMP, JONES & COULTHARD, LLP**
3800 Howard Hughes Pkwy, 17th Floor
Las Vegas, Nevada 89169
Telephone: (702) 385-6000
Facsimile: (702) 385-6001
c.harris@kempjones.com
*Attorneys for Class*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| MARY GIBBS-BOLENDER,<br>Plaintiff,<br><br>vs.<br><br>CAG ACCEPTANCE, LLC, a foreign limited liability company; DOES I through X, inclusive;<br>and ROES 1 through 10, inclusive,<br>Defendants. | Case No.: 2:14-cv-01684-APG-GWF<br><br>**AFFIDAVIT OF MARY GIBBS-<br>BOLENDER** |

STATE OF NEVADA       )
                      ) ss:
COUNTY OF CLARK       )

1

I, MARY GIBBS-BOLENDER, being duly sworn according to law, depose and state as follows:

1. I am a resident of the City of Las Vegas, Clark County, Nevada.
2. On August 3, 2013, I went to Chapman Chrysler Jeep to purchase a vehicle.
3. I was directed to purchase a 2008 Dodge Caravan.
4. I was there from 10 a.m. – 4 p.m.
5. On August 3, 2013, I was presented a stack of documents which I was told just to sign.
6. On August 3, 2013, I was not informed what the individual documents I was presented to sign were.
7. I was not given a choice to sign any document I was presented to sign.
8. My payments were supposed to be $376.28 ($188.14 bi-weekly).
9. On August 3, 2013, the term arbitration was not explained to me.
10. On August 3, 2013, I did not know what a class action was and the term was not explained to me.
11. On Monday, August 5, 2013, I called Tommy L. Smith and he said that everything went through and I was approved as is.
12. On Thursday, August 8, 2013, Josefina Soto called me and told me that I needed to show income from my roommate.
13. I told her that I have never had a roommate as I live with my three children.
14. I told her I do not have any income other than the income I provided, which is social security for my three children and my retirement.
15. Josefina told me that my payment would be going up to approximately $406.00 if I wanted to keep the 2008 Dodge Caravan.

16. I told her that I refused to sign a new contract with that high of a payment.

17. Josefina said that she would look for a new vehicle for me.

18. I called Tommy and asked him why my payment was going up.

19. He said that because my payment was changing from biweekly to monthly the payment had to be higher.

20. I then looked at the Chapman web site and found the 2005 Chrysler Town & Country.

21. I called Josefina and told her that I wanted to test drive the 2005 Chrysler Town & Country because the purchase price was only $6,999.00.

22. On August 13, 2013, I went to Chapman to test drive the 2005 Chrysler.

23. I was there from about 9 or 10 am until about 2 or 3 pm.

24. I dealt with Alex the sales manager for this new transaction.

25. I had to fill out all new documentation.

26. When I got the Chrysler I got it because I thought the payments would be lower as I couldn't afford to make the higher $406.00 payments.

27. I dealt with a different Finance & Insurance person as Tommy and I had gotten into a fight because of the higher payment on my initial contract.

28. I was told my payment was $389.43.

29. I asked him why my payment was higher since this vehicle was cheaper than the last document.

30. He said that there were fees charged and that there was no way that I could avoid paying those fees.

31. I drove off with the vehicle that day.

32. I was never provided a green slip on the contract dated August 13, 2013.

3

33. On about September 6, 2013, I was told that I had to come in and sign a new contract because Chapman did not send it to CAG on time and that the contract was expired.

34. I did not get my green slip until the day before my placard expired.

35. No one ever informed me, prior to purchasing the vehicle, that I was going to only have a three day grace period before my vehicle would be turned off.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
MARY GIBBS-BOLENDER

SUBSCRIBED AND SWORN to before me this 3RD day of November, 2014.

_____
Notary Public

A. ROSA NAJERA
NOTARY PUBLIC
STATE OF NEVADA
My Commission Expires: 04-13-15
Certificate No: 99-36092-1

4